# United States Court of Appeals
## For the First Circuit

Nos. 99-2221
     00-1116

JACK SHEEK,

Plaintiff, Appellee,

v.

ASIA BADGER, INC.,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Reginald C. Lindsay, U.S. District Judge]

Before

Torruella, Chief Judge,

Bownes, Senior Circuit Judge,

and Boudin, Circuit Judge.

William A. Zucker, with whom Risa G. Sorkin and Gadsby Hannah LLP,
were on brief, for appellant.
     Dana A. Curhan, with whom Kenneth Levine, Ross Annenberg and
Annenberg and Levine, were on brief, for appellee.

December 29, 2000

**TORRUELLA, <u>Chief Judge</u>.** On March 9, 1994, plaintiff-appellee Jack Sheek, while working as an employee of Mobil Oil Singapore Private Ltd. ("Mobil") in Jurong, Singapore, slipped on a small pipe and injured his shoulder. Sheek brought suit in United States district court against defendant-appellant Asia Badger, Inc. ("Asia Badger"), alleging that Asia Badger or one of its subcontractors performed certain repiping work and negligently failed to correct a known hazardous condition which proximately caused him serious injuries. A jury found in favor of Sheek and awarded him $387,000. Asia Badger appeals, arguing that the district court committed reversible error by: (1) making erroneous evidentiary rulings; (2) giving the jury confusing and misleading jury instructions; and (3) denying Asia Badger's post-verdict motions for judgment notwithstanding the verdict and a new trial.

For the reasons set forth below, we affirm the district court on all issues.

## I. BACKGROUND

The basic facts of the case may be summarized as follows.

### A. The Project

In June 1992, Sheek went to Jurong, Singapore to work as an operations specialist on a new aromatics plant under construction by Mobil (the "Project"). Asia Badger, a wholly-owned subsidiary of Badger Engineering, Inc., was the general contractor on the Project.

During the Project's early stages, Sheek worked during the day and was responsible for walking through the plant and reporting on the work being done by Asia Badger. Part of his report included operational problems, or "punch list" items, that needed to be corrected. Sheek referred these items, directly or through intermediaries, to Asia Badger. In turn, Asia Badger or its subcontractors worked on the identified problems.

In January 1994, Sheek became the night superintendent and began working twelve-hour shifts from 6:00 p.m. to 6:00 a.m. Sheek ran equipment, flushed pipes, and completed other start-up tasks in order to prepare the plant for operation. Sheek also continued to identify punch list items which were passed on to the day shift. These items were addressed during the day, and Sheek checked the progress of the work while on duty at night.

In mid-January or early February 1994, Mobil discovered that four xylene splitter pumps were operating at excessively high temperatures. Tests indicated that the piping was too small, preventing cooling water from adequately circulating through the pumps. Sheek received orders to take these pumps out of service so that work could be performed on them during the day shift. The pumps required two types of work. The first was maintenance work, such as the replacement of seals and bearings damaged by the lack of coolant: this involved unscrewing a flange, removing piping, replacing the parts, and

screwing the piping back together.  The second type of work involved repairing the actual design defect, i.e., cutting out the inadequate cooling pipes and replacing them with larger diameter piping.  Like other punch list items, Sheek noted the work completed on the pumps when he arrived on duty in the evening.

**B.  Sheek's Accident**

When the facility entered its final stages of construction in early 1994, Mobil gradually took control of sections of the plant as they became operational and expanded its maintenance work in those areas.  Full mechanical acceptance of the plant by Mobil occurred on March 1, 1994.  One week later, on March 8, Mobil held a dedication ceremony for the plant.  In preparation, some areas of the plant were shut down and cleaned.

Also on March 8, Sheek received instructions to take the last of the four pumps, the "D" pump, out of service.  On the evening of March 9, Sheek observed that some of the piping in the D pump had been changed to a larger diameter size. At 11:00 p.m. that same evening, Mobil workers arrived with a large control valve which had been removed during the day for maintenance.  Sheek checked up on the workers several times as they reinstalled the valve.  At about 3:00 a.m. on March 10, Sheek walked past the xylene splitter pumps on his way to look at the valve once more, since the work was nearing completion.  As Sheek neared the D pump, he stepped on a piece of pipe, fell backwards,

threw his right arm behind him and grasped a drain line to break his

fall.  As he got up, Sheek saw the pipe, removed it from the walkway

and continued with his shift.

**C. Injury and Treatment**

When Sheek awoke the next morning, he felt pain in his right shoulder and could not raise his arm. On March 12, Sheek saw Dr. Jimmy Darwulla, an orthopedic surgeon in Singapore. Dr. Darwulla determined that Sheek had a partial tear in his right shoulder muscle and prescribed medication and physical therapy. That same day, Sheek filed an accident report with Mobil, identifying the pipe he slipped on as the kind being replaced on the xylene splitter pumps. On March 18, Sheek returned to his home in Texas to obtain a visa for a three-week assignment with Mobil in Saudi Arabia, which had been arranged prior to his accident. Although Dr. Darwulla had advised Sheek that he was not fit to go on the assignment, Sheek left for Saudi Arabia shortly thereafter.

After returning from his assignment in Saudi Arabia, Sheek visited Dr. Reid, an orthopedic surgeon in Texas. Dr. Reid diagnosed a complete tear in Sheek's rotator cuff and recommended surgery, which was performed in June 1994. Sheek underwent a second surgery several weeks later to remove bone spurs and scar tissue that was causing him pain. Following the surgery, Sheek accepted a temporary assignment with Mobil but was unable to obtain a full medical release and thus return to work permanently. Sheek declined Mobil's offer to place him on half pay and retired in 1995.

**D. Trial**

Sheek filed suit against Asia Badger in the district court for the Eastern District of Texas on June 1, 1995. On September 5, 1996, the case was transferred to the District of Massachusetts. During the nine-day trial, both parties presented conflicting testimony concerning almost every fact in the case. For purposes of this appeal, we will briefly highlight the evidence relating to three main issues: (i) who replaced the piping work on the xylene splitter pumps; (ii) whether Asia Badger exercised control over the persons who performed the work; and (iii) whether Sheek's injuries were caused by the pipe on which he slipped.

### 1. The Piping Replacement

Asia Badger's central defense was that it was not responsible for the repiping work performed on the pumps. To support this contention, Asia Badger presented the deposition testimony of Gary Steinmetz, who worked as a mechanical engineer for Asia Badger during the Project. According to Steinmetz, the problem with the xylene pumps was a result of a manufacturing error. Specifically, in addition to the inadequate piping, the coolers were grossly undersized and had to be replaced with larger capacity coolers. The piping could not be replaced until the coolers were replaced. Steinmetz testified that Mobil was the only party with the proper equipment to change the piping: Asia Badger did not work with galvanized schedule 40 pipe, identified by Sheek as the type of pipe on which he slipped. The

deposition of Ch Tai, Mobil's venture manager for the Project, supported Steinmetz's testimony by revealing that Mobil had received and replaced both the cooler and piping system in August 1994.

Sheek did not dispute that Mobil changed the coolers and piping in August. He added, however, that a different set of pipes were also changed in March by Asia Badger. Sheek testified that in addition to observing some replaced pipes on the evening of March 9, he had seen a memorandum prepared by Asia Badger indicating that the pipes would be replaced and the design drawings altered accordingly to reflect the change. According to Sheek, moreover, the overheating of the pumps was a result of a design problem. During the period Sheek worked on the night shift, Mobil only performed maintenance work on the xylene pumps. James Syar, a supervisor on the Project at the time of Sheek's accident, also testified that while Mobil replaced seals on the pumps, Asia Badger took responsibility for the pipe replacement beginning in January or February 1994. Syar also witnessed the accident and identified the pipe that Sheek fell on as the same type being replaced on the xylene splitter pumps.

### 2. Control Over the Work Performed

Asia Badger also rejected the notion that it had control over any persons who had allegedly completed the claimed work on the pumps in March 1994. To this end, the testimony of Mark Henderson, a project control manager, indicated that after full mechanical acceptance on

-9-

March 1, 1994, control and custody passed to Mobil. Any remaining work was conducted by Mobil or by Asia Badger subcontractors under Mobil's supervision. Gary Steinmetz also testified that by this time, all but thirteen Asia Badger personnel had left the site.

Sheek, however, countered this theory by testifying that during his day duty in late 1993, he observed Asia Badger workers -- identified by their hats bearing the company's logo -- directing work being done on the plant. Although Sheek himself could not see the actual work performed on the pumps once he assumed the role of night superintendent, he stated that Asia Badger was responsible for all punch list work that involved design defects. Finally, Sheek's closing statement referred to the testimony of Gary Steinmetz, who had stated that Asia Badger's pattern of work was the same both before and after January 1994.

### 3. The Cause of Sheek's Injury

Asia Badger presented Dr. Kennedy, an orthopedic surgeon, to render his expert opinion concerning Sheek's injury. Dr. Kennedy examined Sheek on March 18, 1997 and April 22, 1999 and his two medical reports were admitted as exhibits. During direct examination, he testified that he had also reviewed the evaluation of Dr. Haig, an orthopedic surgeon in Port Arthur, Texas, who had evaluated Sheek's condition on October 26, 1995 as part of a disability rating for the Texas workers' compensation system. Dr. Kennedy then read from a

portion of Dr. Haig's report which described Sheek's alleged activities in Saudi Arabia, including that "he had to do a great deal of heavy work, climbing, pushing, pulling, et cetera, for about 40 days." Dr. Kennedy identified this report as the source of information about Sheek's activities in Saudi Arabia.

On cross-examination, Dr. Kennedy offered the opinion that the progression of Sheek's partial tear into a massive evulsion of the rotator cuff could be explained by Sheek's work in Saudi Arabia. Upon further questioning, Dr. Kennedy acknowledged that he had reviewed Dr. Haig's report since preparing his own April 1999 report. At this point, the court held a voir dire, during which Dr. Kennedy testified that he had read Dr. Haig's report three weeks prior to trial. He also indicated that his opinion concerning Sheek's worsening injury was based, in part, on Dr. Haig's report.

**E.  Jury Instructions and Verdict**

Both parties agreed that Singapore law governed the issues of both direct and vicarious liability. With respect to the latter, the district court instructed the jury as follows:

> The contractor is also liable for the failure of any of his subcontractors to use such reasonable care if the contractor exercised direct supervision and control over the manner in which the subcontractor does this work. Thus, in this case, to prevail, Mr. Sheek must first establish that Asia Badger or one or more of its employees was negligent or that there was negligence on the part of an Asia Badger

-11-

contractor, and that Asia Badger exercised direct supervision and control in the manner in which this subcontractor performed his work.

With respect to the concept of Asia Badger's direct control and supervision over the manner in which the subcontractor performed the work assigned to the subcontractor, I instruct you that direct supervision and control in this context means more than retention of general [sic] Asia Badger to watch over the progress of the work of the subcontractor. It means that Asia Badger must have exercised direct control, not only over what work was to be done, but the actual performance of the subcontractor as well.

In addition, the special verdict form submitted to the jury contained the following question concerning negligence: "Were employees or agents of the defendant, Asia Badger, negligent in performing the work in the area of the alleged incident?" The court denied Asia Badger's request to modify both the instructions and the verdict form.

During its deliberations, the jury sent the court a note asking, "Regarding Number 3 on the Verdict Form, is Mr. Sheek's negligence restricted to the time of the accident or could it include the subsequent recovery period?"[1] The court answered the jury:

I have instructed you that you are to determine whether in the first instance, negligence on the part of employees or agents as I described, as I defined agents, caused the injury to Mr. Sheek, and if you determine that it did, that is to say that negligence was the proximate cause of injury to Mr. Sheek, then you are to determine whether negligence on the part of Mr. Sheek was a proximate cause of his injury.

---

[1] Question Number 3 asked, "Was Jack Sheek negligent?"

> The underlying question in the analysis is of course what is the injury.
>
> And depending on how you determine, what you determine the nature of the injury to be that Mr. Sheek has is how you answer that question. So my answer to you in short will be, it depends. It depends on what you say the injury is, whether you consider the time -- the time of the accident or you consider some later period.

After additional deliberation, the jury returned a verdict for Sheek in the amount of $430,000, reduced by ten percent, or $43,000, based on its finding that Sheek was also negligent. The court entered judgment on September 8, 1999. On September 17, Asia Badger moved for judgment notwithstanding the verdict and for new trial and remittitur. The district court denied both motions, and this timely appeal followed.

## II. DISCUSSION

Asia Badger challenges the jury's verdict on three grounds. First, Asia Badger contends that various evidentiary rulings prejudiced its case against appellee. Next, Asia Badger asserts that the district court failed to properly instruct the jury on the requirements for vicarious liability under Singapore law. Finally, Asia Badger challenges the sufficiency of the evidence underlying the verdict. We address each of these claimed errors in turn.

### A. Evidentiary Issues

Asia Badger claims that the district court erred in excluding critical portions of Asia Badger's expert testimony. Asia Badger also

contends that the court improperly allowed Sheek and Syar to offer testimony about which they had no personal knowledge.  We disagree.

### 1.  Dr. Kennedy's Testimony

At trial, the district court excluded portions of testimony from Asia Badger's medical expert, Dr. Kennedy, for failure to supplement his medical report to include changes in his medical opinion as required by Fed. R. Civ. P. 26(e)(1).  The court noted that neither of Dr. Kennedy's own reports linked the development of Sheek's massive rotator cuff evulsion to his work in Saudi Arabia, and that consequently, his opinion as to the cause of Sheek's injury was inadmissable.  We will reverse a trial court's decision to admit or exclude expert testimony only when there is an abuse of discretion. Coastal Fuels of Puerto Rico, Inc. v. Caribbean Petroleum Corp., 175 F.3d 18, 34 (1st Cir. 1999); Licciardi v. TIG Ins. Group, 140 F.3d 357, 362-63 (1st Cir. 1998).

Fed. R. Civ. Proc. 26(e)(1) requires a party to supplement its disclosures "if the party learns that in some material respect the information disclosed is incomplete or incorrect and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing."  As we have noted previously, the supplement requirement helps a party avoid the burden of responding to unexpected and last-minute changes in its opponent's expert testimony.  See Licciardi, 140 F.3d at 363.  This, in

-14-

turn, promotes the broader purpose of discovery, which is "the narrowing of issues and the elimination of surprise." Johnson v. H.K. Webster, Inc., 775 F.2d 1, 7 (1st Cir. 1985) (internal quotation marks omitted).

Asia Badger asserts that, as an initial matter, it did not violate Rule 26 because Dr. Kennedy was originally scheduled to testify after the close of appellee's case. Since by this time Dr. Haig's report would have been introduced into evidence by appellee, Dr. Kennedy would be qualified to testify based on the Haig report pursuant to Fed. R. Evid. 703, which states that "[t]he facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to him at or before the hearing." Fed. R. Evid. 703. According to Asia Badger, although Dr. Kennedy had to testify earlier than planned due to scheduling conflicts, the same result should ensue.

We are not persuaded by this evidentiary sleight of hand. It seems clear that Rule 703, which outlines the permissible bases for expert testimony, was not designed to thwart the goals of open and fair discovery embraced by Rule 26. Here, Dr. Kennedy revealed during voir dire that Dr. Haig's report -- written in 1995 -- was provided to him by Asia Badger at least three weeks prior to trial. In addition, Asia Badger itself introduced the report and questioned Dr. Kennedy on its contents, suggesting that it was aware of his changed opinion. Thus,

-15-

even if appellee intended to introduce Dr. Haig's report before Dr. Kennedy testified (which is itself uncertain), Asia Badger would not be excused from its duty to abide by the rules of discovery and inform appellee of the change in the expert's pretrial report. See Licciardi, 140 F.3d at 365 (defendant required to inform plaintiff of material change in expert's opinion, even where plaintiff might have reason to expect that it might change); see also Thibeault v. Square D Co., 960 F.2d 239, 244 (1st Cir. 1992) (emphasizing that this Court attempts "to ensure that the spirit of open discovery embodied in Rule 26 is not undermined either by evasion or dilatory tactics"). Furthermore, appellant offered no explanation whatsoever for its failure to amend Dr. Kennedy's reports to reflect his new opinion. There is thus ample support in the record for the district court's conclusion that Asia Badger stood in violation of Rule 26(e)(1), and we do not believe that Rule 703 was intended to end-run this basic requirement of fair play.

When faced with a discovery violation, the district court "possesses wide latitude in formulating the appropriate sanction." Poulin v. Greer, 18 F.3d 979, 984 (1st Cir. 1994). Under the Federal Rules of Civil Procedure, a party that fails to disclose information under Rule 26(e)(1) "shall not . . . be permitted to use as evidence . . . any witness or information not so disclosed." Fed. R. Civ. P. 37(c). Although the court originally ruled to exclude all of Dr. Kennedy's testimony -- a sanction well within the district court's

-16-

scope of discretion -- the court ultimately decided to strike only those portions of Dr. Kennedy's testimony based on the passage in Dr. Haig's report describing Sheek's activities in Saudi Arabia.  It is true, as Asia Badger points out, that causality was an important issue in this case.  However, Dr. Haig's report itself remained in evidence, and the jury was free to infer, as Asia Badger argued in its closing, that Sheek's activities in Saudi Arabia contributed to his injury. Given its minimal impact on appellant's case, the district court's sanction was relatively lenient and we see no reason to disturb it.

## 2.  **Sheek and Syar's Testimony**

Asia Badger challenges the admission of (1) Sheek's testimony that the cooling water issue was a "design" problem rather than a maintenance problem and that Asia Badger was responsible for the design work; (2) Sheek's testimony regarding the purpose of the repiping work; and (3) Sheek's rebuttal testimony that the work done in August of 1994 described by Ch Tai was not the same work done in March of that year. Appellant also challenges Syar's deposition testimony that Asia Badger handled the repiping work in March of 1994, arguing that Syar did not personally observe the work being done.  We review evidentiary issues for abuse of discretion.  Kelley v. Airborne Freight Corp., 140 F.3d 335, 345 (1st Cir. 1998).

Fed. R. Evid. 602 requires that a witness have "personal knowledge" about the matter to which he testifies.  Such knowledge can include "inferences and opinions, so long as they are grounded in personal observations and experience." United States v. Rodríguez, 162 F.3d 135, 144 (1st Cir. 1998) (quoting United States v. Neal, 36 F.3d 1190, 1206 (1st Cir. 1994)); see also Fed. R. Evid. 701.  We believe that the record supports the district court's conclusion that Sheek and Syar met this threshold in each of their disputed statements.

First, as his testimony reveals, Sheek had been a Mobil employee for twenty-eight years, beginning as an operator in a chemical processing unit.  He later worked as a controlman and then as a

production supervisor during the construction of new Mobil plants in the United States and abroad. By the time he arrived in Singapore, Sheek had completed two years of pre-engineering work in Cambridge, Massachusetts, which involved reviewing drawings and providing input into the design of the Project. During his day duty, Sheek was personally responsible for relaying, directly or indirectly, all punch list items to Asia Badger. Finally, Sheek also observed a memorandum from Asia Badger outlining the modifications of the piping.[2] Combined, these factors provided a sufficient foundation for Sheek to identify the cooling water issue as a design defect and to infer that Asia Badger had performed the design work. Given his experience and observations, moreover, Sheek was qualified to testify that the purpose of the repiping was to increase the flow of the cooling water -- a fact that appears uncontroverted by both parties.

Sheek's rebuttal testimony did not even require inference or opinion, but was grounded in his personal observations alone. According to the deposition testimony of Ch Tai, Mobil performed modifications on the cooling water pipes that led to the xylene splitter pumps in August 1994. This work allegedly took place in the aromatics unit, an area that Sheek supervised for a period of three months. Sheek countered that during one of his shifts in March 1994,

---

[2] The district court properly admitted this testimony as an admission by a party opponent. Fed. R. Evid. 801(d)(2).

he observed that the piping in the D pump had been changed to a larger diameter size. Sheek therefore had the personal knowledge to not only distinguish the work described by Tai (on the pipes leading to the pumps) from that which he observed (within the pump itself), but also to testify that they involved different locations within the aromatics unit.

Finally, the court properly admitted James Syar's testimony that Asia Badger performed the repiping work. Syar's deposition testimony included the following colloquy:

Q:      Okay. When you say December and April are you talking about December '93 and April '94?

A:      Yes.

Q:      All right. You were on the night shift that whole time period?

A:      Yes.

Q:      Okay. Now, the work being done on these cooling water pipes, that was done during the daytime?

A:      Most of them were done -- yeah, because we were limited to what we could have done at night.

Q:      Okay. So it's yes that they -- that they were?

A:      Yes.

Q:      Okay. So you couldn't have actually seen the work being done, is that right?

A:      On that particular pipe, no. I-piping, only if they were there, worked over at night.

Q:      And did they?

A:        I was there for some of it.  Now, for the main header, that was done during the day.  Most of the time what we dealt with was just what connected to our pumps so....

Q:        All right.  Tell me -- tell me the dates when you actually saw the work being done at night.

A:        I can't.  I can't do that.

Although appellant makes much of the court's initial impression that the testimony was "unclear," the court subsequently concluded that Syar's testimony indicated that some of the repiping work took place at night, while he was working.  In fact, Syar affirmatively responded that some of the work took place in his presence.  The fact that Syar was unable to specify the dates on which he saw the work being done may affect the weight, but not the admissibility, of his testimony.  See Neal, 36 F.3d at 1206.  Viewing his statements as a whole, Syar demonstrated sufficient personal knowledge to testify to the party responsible for the repiping work on the xylene pumps.

In sum, we hold that the district court did not abuse its discretion in admitting any of the testimony claimed as error by appellant.

**B.  Jury Instructions**

Asia Badger next contends that the district court provided misleading and confusing instructions on the issue of vicarious liability and then exacerbated that error through a poorly-worded special verdict form.  Once again, we cannot agree.

## 1. **The Jury Charge**

According to Asia Badger, the district court erred when it refused its request to "enumerate and clarify the standard" for vicarious liability.[3] Because Asia Badger objected to the court's

_____

[3] Asia Badger's request included the following instruction:

1. The burden is on Mr. Sheek to prove by a preponderance of the evidence that it was an Asia Badger employee, and not any other person or entity, who failed to use reasonable care with regard to the pipe which is alleged to have caused the plaintiff's injury.

2. If you believe that another person or entity failed to use reasonable care with regard to the pipe, including an Asia Badger subcontractor, then Asia Badger is not liable unless Asia Badger actually exercised direct detailed control over [the] manner of the doing of the work of the person or entity or subcontractor who failed to use reasonable care with regard to the pipe.

3. In this case, Asia Badger is only liable for the actions of one of its subcontractors if an Asia Badger employee personally supervised and directed the manner and details of the doing of the work of that subcontractor.

4. Direct supervision and control is more than retention of the general rights of watching over the progress of the work which the subcontractor agreed to do. You must find that Mr. Sheek has proved by a preponderance of the evidence that Asia Badger not only determined the work to be done but that an Asia Badger employee exercised direct control over the actual performance of the work which caused the injury. This means that there must be actual control and direction of the details of the manner in which the subcontractor performed the allegedly negligent work.

5. For example, if an Asia Badger employee was at the location of the subcontractor's work and personally directed the work of the subcontractor's workers, including the details and manner in which the work to be done, and the subcontractor's workers took instructions from him, then Asia Badger would be liable for the work. On the other hand, if no Asia Badger employee personally directed the work of the subcontractor's workers, then Asia Badger

instructions before the jury retired, it met the requirements of Fed. R. Civ. P. 51 and must be reviewed to see whether there was error and, if so, whether it was harmless. Beatty v. Michael Bus. Mach. Corp., 172 F.3d 117, 121 (1st Cir. 1999). To this end,

> [t]he rules of decision are uncontroversial. "The trial court's refusal to give a particular instruction constitutes reversible error only if the requested instruction was (1) correct as a matter of substantive law, (2) not substantially incorporated into the charge as rendered, and (3) integral to an important point in the case." Elliott v. S.D. Warren Co., 134 F.3d 1, 6 (1st Cir. 1998) (quoting United States v. DeStefano, 59 F.3d 1, 2 (1st Cir. 1995)). Similarly, the giving of an instruction is reversible error only if it (1) was misleading, unduly complicating, or incorrect as a matter of law, and (2) adversely affected the objecting party's substantial rights. Levinsky's Inc. v. Wal-Mart Stores, Inc., 127 F.3d 122, 135 (1st Cir. 1997).

Faigin v. Kelly, 184 F.3d 67, 86-87 (1st Cir. 1999). Using these guidelines, we discern no error in the district court's instruction.

Asia Badger meets the first and third prongs of the test for the court's refusal to accept its proffered instruction. Both parties agree that Singapore law governs the issue of vicarious liability. For

---

is not liable. In addition, if Asia Badger directed the subcontractor what work was to be done, but did not provide detailed control over the manner of the doing of the work, then Asia Badger is not liable.

6. Thus, if you find that Mr. Sheek has not shown by a preponderance of the evidence that Asia Badger exercised direct control over the manner in which the persons or entities performed the work that caused Mr. Sheek's injury, then you must find in favor of Asia Badger.

this issue, both Sheek and Asia Badger cite as authority Mohd bin Sapri v. Soil-Build Private Ltd., 1996 SLR Lexis 324 (Sing. Ct. App. 1996), which held that a party was not liable for the negligent act of its subcontractor because the party did not control the work of the subcontractors and was not involved in any substantial supervisory or coordinating capacity. Id. at *29 ("[The party] had left the matter entirely to is sub-contractors."). Distinguishing the facts in Soil-Build from an English case where such liability was found to exist, McArdle v. Andmac Roofing Co., 1 Eng. Rep. 583 (Eng. C.A. 1967), the Singapore court highlighted two scenarios where a contractor may be liable for the negligence of its subcontractors.[4] Soil-Build, 1996 SLR Lexis 61 at *28. First, the party may be liable where the working conditions are inherently dangerous, thereby "requiring the exercise of a significant degree of supervision and control over persons with whom he has no contractual relationship." Id. Alternatively, the party may owe a duty of care if "he [has] taken it upon himself to exercise a degree of control and actively coordinate the [sub]contractors' activities, given that the work environment itself involved inherent risks or danger." Id.

---

[4] It should be noted that the court was concerned with a party's liability towards the employees of its subcontractor, rather than towards third parties in general. See Soil-Build, 1996 SLR Lexis 61 at *28.

The record suggests that the parties and the court took the second route for determining liability. To be sure, Sheek did not argue that Asia Badger was <u>required</u> to exercise control over its subcontractors or third parties due to the "inherent danger" of the work and facilities, nor did Asia Badger defend on this theory. Rather, the issue presented to the jury was whether Asia Badger did, in practice, exercise control over the claimed repiping work, which would lead to a duty of care to Sheek. On this point, Asia Badger's proposed instruction was correct as a matter of substantive law: it required the jury to find that an Asia Badger employee "personally supervised and directed the manner and details of the doing of the work of that subcontractor" in order to be liable for the negligence of its subcontractor.[5] It is unquestionable, moreover, that the issue of vicarious liability was integral to an important point -- perhaps the most important point -- of the case.

Nevertheless, the refusal to incorporate the exact wording offered by the appellant will not constitute error unless the court failed to substantially incorporate the offered theory in its instruction. <u>Elliott</u>, 134 F.3d at 6. According to Asia Badger, the court did not properly instruct the jury on the elements of vicarious

[5] Asia Badger appears to have taken this statement of law from <u>McArdle</u>, as articulated by the Singapore court. <u>Soil-Build</u>, 1996 SLR Lexis 61 at *17 ("[In <u>McArdle</u>, the party] personally directed the work of the sub-contractors, including the details and manner in which the work was to be done.")

liability, namely, that a party must have control over "the details and the manner of the work to be done" by the subcontractor. However, we can find no disparity between this concept and the court's charge to the jury. The court explicitly noted that the jury was required to find that Asia Badger exercised "direct control, not only over what work was to be done, but the actual performance of work of the subcontractor as well." This indicated to the jury that it was to consider both the "details and the manner" of the work performed. When the court has sufficiently conveyed a litigant's theory, that litigant is not "entitled to dictate the turn of phrase the judge should use to acquaint lay jurors with the applicable law." Id. We therefore uphold the district court's refusal to give the instructions offered by Asia Badger.

However, Asia Badger also claims that the given instruction, though incorporating its theory of applicable law, nonetheless confused and misled the jury. We find this contention without merit. If anything, the court condensed the lengthy and somewhat repetitive instruction offered by Asia Badger into concise and straightforward language that would be more easily comprehended by the jury. See id. at 7 (decision to give a general statement of law in order to avoid potential confusion from proffered instruction by counsel lies "uniquely within the trial judge's discretion"). As we noted above, the court offered a correct statement of the law, and appellant has

failed to identify any misleading or unduly complicating aspect of the given instruction. Since we find none, we hold that there was no error in the jury charge rendered by the district court.

We also reject appellant's challenge to the adequacy of the court's response to the jury's query. We acknowledge that jury instructions given during the course of deliberations come "at a particularly delicate juncture" and require the court to construct its wording carefully. Testa v. Wal-Mart Stores, Inc., 144 F.3d 173, 175 (1st Cir. 1998) (warning that "the court can err as easily by overinclusiveness as by underinclusiveness"). However, we have also noted that as long as the court correctly addresses the issue submitted by the jury, it may amplify the instruction at its discretion. See id. at 176. The court here, after reminding the jury that it first needed to resolve the issue of negligence, proceeded to explain that Mr. Sheek's negligence could include either the time of the accident or "some later period," depending on the nature of the injury. While it may be true that the court could have phrased its answer more simply, we find no basis to conclude that the instruction was confusing, misdirecting, or misleading. See Steckstor v. Hancock, 984 F.2d 274, 278 (8th Cir. 1993) (concluding that district court's reference to insurance in answering jury's question concerning liability, though "unfortunate," was not error). We presume that the jury followed the court's instruction, United States v. González-Vázquez, 219 F.3d 37,

-27-

48 (1st Cir. 2000), and Asia Badger's disappointment that the award was reduced by "only" ten percent for comparative negligence does little to rebut this presumption.

### 2. **Verdict Form**

Asia Badger also objects to the wording of the verdict form, which it argues conflated the issues of direct and vicarious liability. A verdict form must be "reasonably capable of an interpretation that would allow the jury to address all factual issues essential to judgment." Johnson v. Teamsters Local 559, 102 F.3d 21, 28 (1st Cir. 1996) (quoting United States v. Real Property Located at 20832 Big Rock Dr., 51 F.3d 1402, 1408 (9th Cir. 1995)). We examine the court's instructions to the jury and the wording on the verdict form as a whole to determine whether the issues were fairly presented to the jury. Id. at 28.

As we have already discussed, the court clearly instructed the jury on the requirements for vicarious liability. The court also separately addressed Asia Badger's direct liability for its own employees. Given this distinction, the jury could reasonably interpret the phrase "employees or agents" included in Question 1 of the verdict form to refer to employees or subcontractors and hence, the respective theories of direct and vicarious liability. If "the general charge adequately directs the jury to its duties in answering the questions submitted to it there is no need to accompany the submission with

repetitive instruction." Id. (quoting Lawrence v. Gulf Oil Corp., 375 F.2d 427, 429 (3d Cir. 1967)).  Since the jury was so directed, we hold that the court was not required to ask separate questions concerning direct and vicarious liability in the verdict form.

## C.  Sufficiency of the Evidence

Finally, Asia Badger maintains that the district court erred in refusing its motions for judgment notwithstanding the verdict and new trial, because the evidence was insufficient as a matter of law to sustain the jury's verdict.  Specifically, Asia Badger contends that Sheek failed to establish two crucial elements of his claim: that Asia Badger or its subcontractors actually performed the repiping work in March 1994 and that Asia Badger exercised control over any work so performed.  Our standard of review is de novo, viewing all facts and inferences in the light most favorable to the verdict.  Sinai v. New England Tel. & Tel. Co., 3 F.3d 471, 472 (1st Cir. 1993).

First, Asia Badger contends that the evidence establishes, "unequivocally," that Mobil did the repiping work.  The facts and inferences most favorable to Sheek, however, suggest otherwise.  Sheek testified that on March 8, 1994, he took the D pump out of service. The next evening, he observed that some of the piping within the pump had been changed to a larger diameter.  A jury could reasonably infer, despite Tai's testimony to the contrary, that some repiping work was

indeed performed on the pumps in March of 1994.[6] With respect to the March 1994 work, moreover, Sheek conceded that Mobil performed maintenance work -- such as replacing the seals -- on the xylene pumps. He noted, however, that in the course of this work, any piping that was removed would necessarily have to be reconnected. Based on this testimony, a jury could reasonably believe that the pipe on which Sheek slipped could not be related to the work done by Mobil. Finally, Asia Badger's performance of some punch list work,[7] Sheek's observation of a memorandum from Asia Badger outlining repiping work to be done in the field, and the fact that some work on the pumps was performed at night by Asia Badger in Syar's presence all provide a sufficient foundation

---

[6] In fact, a jury need not even disbelieve Tai to arrive at this conclusion: since Sheek identified the August 1994 work described by Tai as "further downstream" from the work he himself observed, the conclusion that someone changed the piping within the pumps in March 1994 is not inconsistent with Mobil's replacement of the piping leading from the pumps to the main headers in August 1994. Similarly, refuting appellant's claim that Asia Badger did not "use" schedule 40 pipe is not a sine qua non of Sheek's case, as appellant would have us believe. On the contrary, Sheek identified schedule 40 pipe as the type being removed from within the pumps. It is entirely possible, then, that Asia Badger, while not utilizing this type of pipe in its own work, nevertheless removed this type of piping from a pump manufactured by someone else.

[7] Steinmetz testified that both Mobil and Asia Badger took responsibility for punch list work after January 1994. Although Asia Badger claims that there is no evidence that the repiping formed part of the punch list work, Sheek's definition of a "punch list" as an "operational problem" supports the inference that the pumps' piping problem would be included on this list.

for the conclusion that work done on the pumps in March 1994 was done by Asia Badger or one of its subcontractors.

We also believe that there was sufficient evidence for the jury to find that any work performed was done under the supervision of Asia Badger.  Asia Badger emphasizes that no one witnessed Asia Badger exercise control over a subcontractor after January 1994.  However, Sheek testified that during his day duties in late 1993, he saw Asia Badger employees actually directing work done by its subcontractors.  Steinmetz further testified that Asia Badger's work continued in the same manner before and after January 1994.  Taken together, these two pieces of evidence could, as the district court noted, support the inference that Asia Badger controlled the work done by its subcontractors in the period from January to March of 1994 in the same way that Sheek described this control before January 1994.

Although Asia Badger presents numerous inconsistencies and alternative theories based on the facts, we do "not consider the credibility of witnesses, resolve conflicts in testimony, or evaluate the weight of the evidence."  Hendricks & Assoc., Inc. v. Daewoo Corp., 923 F.2d 209, 214 (1st Cir. 1991) (quoting Wagenmann v. Adams, 829 F.2d 196, 200 (1st Cir. 1987)).  Rather, we will uphold the jury's verdict unless the evidence points "to one conclusion and one conclusion only: that the losing party was entitled to win."  Sinai, 3 F.3d at 473.  Without a doubt, the facts here are myriad and conflicting.  Wading

through this morass, however, we believe there is enough evidence to support the jury's verdict in favor of Sheek.

### III.  CONCLUSION

The judgment of the district court is **affirmed** in all respects.