# United States Court of Appeals
## For the First Circuit

No. 00-2498

JEROME JARRETT,

Plaintiff-Appellee,

v.

TOWN OF YARMOUTH, GERARD BRITT,
CHERYL NUGENT GOMSEY, RICHARD WHITE,
Defendants,

PETER MCCLELLAND, ROBERT CHAPMAN
Defendants-Appellants.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Joseph L. Tauro, U.S. District Judge]

Before

Torruella, Circuit Judge,
Coffin, Senior Circuit Judge,
and Lipez, Circuit Judge.

Leonard H. Kesten, with whom Deidre Brennan Regan and Brody, Hardoon, Perkins & Kesten were on brief, for appellants Peter McClelland and Robert Chapman.
Donald W. Cook, with whom Kathleen J. Wood was on brief, for appellee.

May 6, 2003

**Per Curiam**.  On December 16, 1994, Jerome Jarrett fled the scene of a minor traffic accident and was subsequently apprehended by Shadow, a police dog controlled by Yarmouth Police Officer Peter McClelland.  Shadow bit Jarrett at least twice on the leg in the course of corralling him before officers arrived to take the suspect into custody.  Jarrett filed 42 U.S.C. § 1983 claims against Officer McClelland and Robert Chapman, the Yarmouth Chief of Police,[1] alleging that McClelland used excessive force in releasing Shadow, and that Chief Chapman "tolerated a pattern and practice of unjustified, unreasonable and excessive force regarding McClelland's use of a dog to attack and bite."  Jarrett also brought suit against the Town of Yarmouth, seeking to hold the municipality liable under a Monell theory, see Monell v. New York Dep't of Soc. Services, 436 U.S. 658 (1978), for promulgating a dog apprehension policy that deprived him of his constitutional rights.

After a bifurcated trial, a jury returned verdicts against both Officer McClelland and Chief Chapman.[2]  The defendants

---

[1]Jarrett also brought claims against Yarmouth police officers Gerard Britt, Cheryl Nugent Gomsey, and Richard White, but did not pursue these claims at trial.

[2]The jury was not explicitly invited to issue a verdict with respect to the Town in either phase of the trial; indeed, neither the jury instructions nor the verdict forms expressly referenced the Town as a party.  These omissions have created some dispute as to whether Jarrett properly preserved his municipal liability claim below.  Close scrutiny of the record reveals that Jarrett's counsel did preserve the Monell claim, anticipating that if jury verdicts against Chapman and/or McClelland were later reversed on grounds of

-2-

now contest the verdicts on appeal, arguing that the court erred in denying their request for qualified immunity, and raising a host of evidentiary challenges. After careful review, we find that Jarrett suffered no constitutional injury. Accordingly, we vacate the judgments against McClelland, Chapman, and the Town of Yarmouth.

## I.

In the early morning hours of December 16, 1994, Yarmouth Police Officer Gerard Britt observed the defendant sitting in his car in a motel parking lot off of Route 28. Officer Britt then saw Jarrett quickly exit the motel parking lot and drive off in the opposite direction on Route 28. Britt radioed to fellow officer Richard White, and the two officers unobtrusively tracked Jarrett, who was driving in excess of sixty miles per hour. Several minutes later, Jarrett exited into another parking lot off of Route 28. Officer White followed Jarrett off the exit while Officer Britt continued up the road and entered the parking lot from the opposite end. The parties dispute what happened next. The appellants claim that Officer Britt, now driving toward Jarrett, activated his lights and signaled for Jarrett to stop. Yet Jarrett continued driving directly toward Britt, who swerved abruptly and narrowly avoided a collision. Jarrett insists that Britt never activated

qualified immunity notwithstanding the commission of a constitutional violation, Jarrett could still claim attorney's fees from the Town if it was implicated in the violation. However, for the reasons that follow, we find that Jarrett's municipal liability claim fails as a matter of law.

his lights and that there was no near-collision. Both parties agree, however, that Jarrett proceeded to drive into an adjoining parking lot, where he ran into a cement post. Jarrett then exited the vehicle, scaled a nearby fence, and fled into a residential neighborhood.

At this point, two additional Yarmouth police officers joined the chase. Officer Cheryl Nugent Gomsey had clocked Jarrett driving over the speed limit while being followed by Officers White and Britt on Route 28, and also observed him hit the cement post and escape over the fence. Officer McClelland, the K-9 officer for the Yarmouth Police, was also radioed to the scene by Officer White, who reported (mistakenly, as it turned out) that he recognized Jarrett as a suspect in a prior armed robbery. Officer Gomsey arrived at the scene shortly after Jarrett fled from the parking lot, and teamed with Officer McClelland and his dog Shadow to track and apprehend Jarrett.

After helping Shadow over the fence, Officer McClelland placed him on his customary 15-foot lead and followed closely behind as the dog tracked Jarrett. Officer Gomsey continued the pursuit at some distance behind McClelland and Shadow so as not to contaminate the scent. For approximately twenty minutes Shadow led the officers along a circuitous route through the residential neighborhood until McClelland spotted Jarrett standing in the middle of the road, approximately fifty yards away. Officer Gomsey

had fallen too far behind to see McClelland, Shadow, or Jarrett, but she heard McClelland yell three times: "Stop, police, or I'll send the dog." McClelland testified that after he issued these warnings, Jarrett accelerated and disappeared around a corner. Only then, according to McClelland, did he release Shadow with instructions to locate Jarrett and hold him.

Shadow is trained to execute the "bite-and-hold" technique upon release, meaning that he will bite and maintain his hold upon a suspect until the handler orders him to let go. Accordingly, a suspect who struggles with a dog trained to bite and hold may be bitten several times if the dog loses his grip and is forced to re-establish his hold. Yet the undisputed evidence at trial indicated that the vast majority of jurisdictions within the United States employ bite-and-hold policies. An alternative technique, not widely adopted, is the "circle and bark" method. A dog trained to circle and bark will circle his target, barking, until his handler arrives. The dog will bite only if the target then attempts to move outside the "circle".

Because Shadow was trained to bite and hold, Officer McClelland knew with a high probability that if Shadow was released, he would bite the fleeing suspect. In fact, within thirty seconds of his release, Shadow apprehended Jarrett by biting him on the leg. Shadow was only out of McClelland's sight for those thirty seconds; as soon as McClelland found Shadow he

commanded him to release Jarrett, and Shadow complied. An ambulance arrived within five minutes and transported Jarrett to a hospital, where he received stitches for cuts on his lower right leg. For the next two weeks Jarrett received daily medical treatment for his injuries; one year after the incident he still complained of pain and an inability to stand.

Not surprisingly, Jarrett recounts a different version of events. At trial, he testified that after finishing his shift at work, he picked up a car that he had recently purchased. He claimed not to have noticed the police officers trailing him on Route 28, and further testified that he pulled off the road into the parking lot because he was experiencing brake problems and trying to find a place to slow down. Jarrett admitted seeing police lights shortly before hitting the cement post, but insisted that he never saw a police cruiser heading toward his car. According to Jarrett, he fled after hitting the cement post because "I was driving illegally for one. And I knew that . . . if I got arrested, I was going to end up going to jail." Indeed, the record indicates that prior to the events in question, a warrant for Jarrett's arrest was issued after he failed to appear at a surrender hearing on a separate matter. However, both parties agree that the police officers pursuing Jarrett on December 16 were not aware of this outstanding arrest warrant.

After jumping the fence, Jarrett testified that he slipped and fell down, at which point he heard someone yell "Stop." He rose to his feet, and again heard someone yell, "Stop, or I'll let the dog go." Jarrett claims that he stopped running and put his hands in the air. Soon thereafter, however, Shadow jumped on his back and bit him twice on the leg in response to verbal commands issued from someone Jarrett could not see. Jarrett was ultimately apprehended by officers McClelland and Gomsey and charged with several misdemeanor offenses: (1) operating a motor vehicle with a suspended license; (2) leaving the scene of an accident; (3) operating an uninsured motor vehicle; and (4) failing to stop for a police officer. He was also charged with several civil infractions: (1) operating an unregistered motor vehicle; (2) failing to yield at an intersection; (3) speeding; and (4) operating a motor vehicle with defective equipment.

## II.

On December 11, 1997, Jarrett filed section 1983 claims against the Town of Yarmouth and five Yarmouth police officers in the District Court of Massachusetts. Jarrett's complaint alleged inter alia that Officer McClelland's act of releasing Shadow constituted excessive force in violation of the Fourth Amendment, characterizing Shadow as an "instrument of potentially deadly force." Jarrett sought compensatory and punitive damages from McClelland for his alleged use of excessive force, and punitive

damages from Chief Chapman for tolerating a pattern and practice of excessive force by Officer McClelland.

The case proceeded to a jury trial, which the court divided into two phases. In the first phase of the trial, the jurors considered Jarrett's excessive force claim against Officer McClelland. They ultimately returned a verdict for Jarrett, finding by a preponderance of the evidence that "Officer Peter McClelland used excessive force on Jerome Jarrett on 12/16/94." However, the jury only awarded Jarrett one dollar in compensatory damages and no punitive damages. Although, as noted above, the Town of Yarmouth was not mentioned in either the jury instructions or on the verdict form, the jury, unprompted, appended to their verdict a recommendation that "the Town of Yarmouth be required from this time forward to . . . . retrain current K-9 units to use the find and bark method."[3] Following the verdict, McClelland and Chapman moved for judgment as a matter of law, renewing the argument that they were entitled to qualified immunity.

The judge denied the motion, and the trial moved into its second phase, where the jury considered Jarrett's claim for punitive damages against Chief Chapman. After hearing the evidence, the jury completed the verdict form for Phase II. In response to the first question -- "Did defendant Peter McClelland

---

[3]Jarrett does not argue on appeal that the jury's "recommendation" alone imposes liability on the Town or has any other binding effect.

act in accordance with the Town of Yarmouth (sic) policy and procedure when he released the dog on December 16, 1994?" -- the jury answered "Yes." As noted, the jury had earlier concluded in Phase I that Officer McClelland used excessive force in apprehending Jarrett on the night in question. See supra. These two findings, coupled with the jury's admonition that the Town should retrain its dogs to use the find and bark method, suggest that the jury found the Town of Yarmouth's bite-and-hold policy to be unconstitutional. The jury ultimately awarded Jarrett punitive damages in the amount of "all reasonable legal fees and expenses incurred by the plaintiff's attorney." The defense objected, and the court ordered the jury to attach a specific dollar amount to their verdict. After further deliberation, the jury came back with a figure of $50,000, and the trial court entered judgment for Jarrett in the amount of $1.00 for Phase I, and $50,000 for Phase II.

McClelland and Chapman subsequently filed post-trial motions for judgments as a matter of law, and, in the alternative, sought new trials under Federal Rule of Civil Procedure 50(b). The motions articulated two grounds for relief: 1) the two officers were entitled to qualified immunity, and 2) the evidence did not support the verdict in either phase of the trial. The district court denied these motions, and the defendants appealed.

# III.

## A. Jurisdiction

As a threshold matter, Jarrett argues that we lack jurisdiction to hear this appeal because the trial court failed to enter a final appealable judgment or order. Specifically, he points to the district court's failure to make any formal disposition of his claims against Officer Gomsey, Officer Britt, Officer White, and the Town of Yarmouth. According to the appellant: "in a multi-defendant case such as this one where an appeal is taken from an order or judgment disposing of claims against less than all defendants, the appeal is premature and must be dismissed."

Our jurisdiction is limited to "all final decisions of the district courts of the United States." United States v. Leichter, 160 F.3d 33, 35 (1st Cir. 1998) (quoting 28 U.S.C. § 1291) (emphasis added). We have previously observed that "[a] 'final decision' is ordinarily one which disposes of all the rights of all the parties to an action." In re Licht & Semonoff, 796 F.2d 564, 569 (1st Cir. 1986). On numerous occasions, however, the Supreme Court has stressed that § 1291 should be construed practically rather than technically. See Firestone Tire & Rubber Co. v. Risjord, 449 U.S. 368, 375 (1981) (referring to "a tradition of giving § 1291 a practical rather than a technical construction"); Cox Broad. Corp. v. Cohn, 420 U.S. 469, 486 (1975).

-10-

Applying this pragmatic approach, at least two circuits have concluded that a federal district court decision is appealable under section 1291 even if it does not formally dispose of claims that were abandoned at trial. See Vaughan v. Mobil Oil, 891 F.2d 1195, 1198 (5th Cir. 1990); American Nat. Bank & Trust Co. of Chicago v. Bailey, 750 F.2d 577, 580-81 (7th Cir. 1984), cert. denied, 471 U.S. 1100 (1985). The Fifth Circuit remarked in Vaughan that it was "inclined to fasten finality upon a judgment that reflects the intention of the judge to dispose of all the business before him or her." 891 F.2d at 1197. Hence, "[a]n order that effectively ends the litigation on the merits is an appealable final judgment even if the district court does not formally include judgment on a claim that has been abandoned." Id. at 1198 (citations omitted). Here, Jarrett does not contest that his claims against Gomsey, Britt, and White were abandoned below. Accordingly, the district court's failure to enter judgment for the three officers is a technical defect that does not undermine our appellate jurisdiction. Firestone Tire, 449 U.S. at 373.

Jarrett also claims, however, that the court failed to enter a verdict on Jarrett's municipal liability claim against the Town of Yarmouth. We disagree. The district court properly entered judgment against Officer McClelland and Chief Chapman, both of whom were sued in their individual and official capacities. Jarrett himself argues that "[w]hen an individual is sued in his

-11-

official capacity, the lawsuit is in reality a claim against the entity."  See Brandon v. Holt, 469 U.S. 464, 471-72 (1985); Nereida-Gonzalez v. Tirado-Delgado, 990 F.2d 701, 705 (1st Cir. 1993) ("An official capacity suit is, in reality, a suit against the governmental entity, not against the governmental actor.").  As a general rule, therefore, a court entering judgment against municipal officers in their official capacities is entering judgment against the municipality as well. Superficially, however, the facts of this case present an additional complication.  While Jarrett sued the officers in both their individual and official capacities, the jury's award of punitive damages in Phase II appears to resolve only Jarrett's claim against Chief Chapman in his individual capacity. See Biggs v. Meadows, 66 F.3d 56, 61 (4th Cir. 1995) ("[An] indication that a suit has been brought against a state actor personally may be a request for . . . punitive damages, since such relief is unavailable in official capacity suits.").

Upon closer examination, the jury's award of punitive damages on the Phase II verdict form does not undermine the finality of the district court's decision with respect to the Town. The proceedings below clearly reflect Jarrett's intent to resolve the Monell municipal liability issue by soliciting the jury's response to question one on the Phase II verdict form: "Did Peter McClelland act in accordance with the Town of Yarmouth policy and

-12-

procedure when he released the dog on December 16, 1994?" The second question on the Phase II verdict form -- "Has the plaintiff proved by a preponderance of the evidence that Chief Chapman permitted and tolerated a pattern and practice of unjustified, unreasonable and excessive force by Officer McClelland with respect to the latter's deployment of Shadow?" -- was then intended to resolve Chapman's liability in his individual capacity for faulty supervision, and the punitive damages awarded related only to Chapman in his individual capacity.

The jury's affirmative response to Question #1, coupled with its earlier finding in Phase I that Officer McClelland used excessive force to apprehend Jarrett, established a basis for imposing liability on the Town for promulgating an unconstitutional policy -- the precise disposition that Jarrett sought for his Monell claim. By entering judgment on both verdicts, the district court terminated litigation on the merits with respect to McClelland, Chapman and the Town, see Vaughan, 891 F.2d at 1198, thereby establishing a final, appealable decision. Accordingly, finding no merit in Jarrett's jurisdictional claims, we proceed to address the alleged constitutional violation.

## B. The Alleged Constitutional Violation

### 1. The primacy of the constitutional question in the qualified immunity inquiry

After the jury issued its verdict against Chief Chapman in Phase II of the bifurcated proceedings, McClelland and Chapman

-13-

moved for judgment as a matter of law, arguing inter alia that the verdicts against them could not stand because the two officers were entitled to qualified immunity. The district court denied their motions, and McClelland and Chapman now argue on appeal that these rulings were in error. "A district court's denial of qualified immunity is a legal question that we review de novo." Davis v. Rennie, 264 F.3d 86, 113 (1st Cir. 2001). In Saucier v. Katz, 533 U.S. 194 (2001), the Supreme Court offered the following general guidance to courts reviewing qualified immunity determinations: "A court required to rule upon the qualified immunity issue must consider . . . this threshold question: Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right? This must be the initial inquiry." Id. at 201.

2.    Reconciling the jury verdicts

Before addressing the merits of the constitutional question, we must establish the factual predicate for our inquiry by determining exactly what facts the jury found. As we observed in Iacobucci v. Boulter, 193 F.3d 14 (1st Cir. 1999): "When a qualified immunity defense is pressed after a jury verdict, the evidence must be construed in the light most hospitable to the party that prevailed at trial . . . [I]n such an exercise, deference should be accorded the jury's discernible resolution of disputed factual issues." Id. at 23 (internal citations omitted).

-14-

After Phase I of the bifurcated trial, the jury determined that Officer McClelland used excessive force when he released Shadow. However, this verdict is consistent with both versions of the facts set forth by the parties at trial. The verdict could have reflected the jury's belief that Officer McClelland ordered Shadow to bite and hold <u>after</u> Jarrett surrendered himself, in which case the appellant clearly suffered a constitutional injury. <u>See</u> <u>Mendoza</u> v. <u>Block</u>, 27 F.3d 1357, 1362 (9th Cir. 1994) ("[N]o particularized case law is necessary for a deputy to know that excessive force has been used when a deputy sics a canine on a handcuffed arrestee who has fully surrendered and is completely under control."). However, it is also plausible that the jury determined that Officer McClelland acted unreasonably, even while crediting his testimony that Jarrett disregarded McClelland's verbal warnings, thereby forcing the officer to release Shadow to apprehend a fleeing suspect. Under these circumstances, it is not clear that Jarrett's Fourth Amendment rights would have been violated.

In resolving this factual ambiguity, we note the jury's explicit finding in Phase II that Officer McClelland acted in accordance with the policies and procedures of the Town of Yarmouth when he released Shadow. Nothing in the record suggests that Yarmouth policies permit an officer to command a police dog to attack a suspect who has already surrendered. In fact, the

relevant regulations, which the defendants introduced at trial, tightly circumscribe the situations in which police officers may use force:

> Non-deadly force[4] may be used by a police officer in the performance of his duty:
> a) when necessary to preserve the peace, prevent commission of offenses, or prevent suicide or self-inflicted injury; or
> b) when necessary to overcome resistance to lawful arrests, searches and seizures, and to prevent escapes from custody; or
> c) when in self-defense, or defense of another against unlawful violence to his person or property.

These regulations cannot be construed to sanction the use of *any* force against a suspect who has surrendered peacefully. Hence, no reasonable jury could accept Jarrett's version of the facts -- that he had already surrendered when Officer McClelland released Shadow -- and simultaneously conclude that McClelland acted in accordance with the policies and procedures of the Town of Yarmouth.

Notably, Officer McClelland also testified during Phase I of the proceedings that additional department regulations compelled police dog handlers to announce "Stop, police, or I'll release the dog" three times before releasing, and Officer Gomsey confirmed that this practice was "routine." Both officers further testified that McClelland in fact issued these warnings before

---

[4]The regulations define non-deadly force as "that degree of force which in the circumstance is neither likely nor intended to cause great bodily harm." By contrast, deadly force is narrowly defined as force "inflicted by firearms."

releasing Shadow on the night in question.  At trial, no witness contradicted the officers' testimony regarding the existence and vitality of these regulations.  Thus, if the jury ultimately found that McClelland acted in accordance with Yarmouth policies and procedures, they must have implicitly found that he issued the proper verbal warnings to Jarrett before releasing Shadow.

In the end, we can safely attribute the following factual findings to the jury: 1) Officer McClelland issued three verbal warnings to Jarrett before releasing Shadow, and 2) at the time McClelland released Shadow, Jarrett had not surrendered to the police, but was resisting arrest by fleeing.  The jury nonetheless determined that the defendant's use of force was excessive under the circumstances.  We must now consider whether this verdict can stand as a matter of law.

3.  Officer McClelland's alleged use of excessive force

"Where . . . the excessive force claim arises in the context of an arrest . . . of a free citizen, it is most properly characterized as one invoking the protections of the Fourth Amendment, which guarantees citizens the right 'to be secure in their persons . . . against unreasonable . . . seizures' of the person."  Graham v. Connor, 490 U.S. 386, 394 (1989).  The Graham Court established a balancing test for determining whether a particular exercise of force is constitutional: "Determining whether the force used to effect a particular seizure is reasonable

-17-

under the Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." Id. at 396 (internal quotation marks omitted). Courts conducting this balancing exercise must undertake a fact-intensive inquiry that is highly sensitive to the circumstances of the particular case:

> Because the test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application . . . its proper application requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.

Id. (internal quotation marks and citations omitted). In reviewing the conduct of law enforcement officials, "[t]he 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." Id. Because objective reasonableness is the touchstone of the excessive force inquiry, the constitutional and qualified immunity inquiries in this area are closely intertwined. See Saucier, 533 U.S. at 206. Hence, the decisions of courts that have previously addressed excessive force claims in the dog-biting context may be instructive even if these claims were ultimately resolved on qualified immunity grounds.

Before turning to the Graham balancing test, we digress briefly to resolve an issue that has been lurking in the background throughout this litigation -- namely, whether releasing a police dog trained to bite and hold constitutes a use of deadly force. The deadly/non-deadly distinction is significant in the Fourth Amendment context; under clearly established law, the use of deadly force is constitutional only if, at a minimum, a suspect poses an immediate threat to police officers or civilians. See Tennessee v. Garner, 471 U.S. 1, 11 (1985). Here, it is undisputed that Jarrett did not pose such a threat. Accordingly, if the release of a police dog is an exercise of deadly force, Officer McClelland clearly violated Jarrett's Fourth Amendment Rights by releasing Shadow to apprehend the appellee as he was running away.

In the leading case of Robinette v. Barnes, 854 F.2d 909 (6th Cir. 1988), the police released a dog into a building to apprehend a burglary suspect. The dog fatally wounded the suspect by biting him in the neck, and the administratrix of the decedent's estate filed a § 1983 action alleging that the police had used "unnecessary deadly force." Notwithstanding the fact that the decedent was killed by the police dog, the Sixth Circuit determined that "the use of a properly trained police dog to apprehend a felony suspect does not carry with it a substantial risk of causing death or serious bodily harm." Id. at 912 (internal quotation marks and footnote omitted). The Ninth Circuit similarly concluded

that the use of police dogs trained in the "bite and hold" technique generally does not constitute deadly force, absent some demonstration by the plaintiff "that properly trained police dogs are reasonably capable of causing death." Vera Cruz v. City of Escondido, 139 F.3d 659, 663 (9th Cir. 1997). Jarrett points us to no contrary authority indicating that the use of trained police dogs is considered deadly force under certain circumstances. In fact, he concedes that "[b]ecause none of plaintiff's witnesses testified that a police dog like McClelland's was deadly force, nor did plaintiff's counsel argue it to the jury, and because the trial court rejected plaintiff's deadly force instruction, the deadly force issue is irrelevant to this appeal."

Consequently, our constitutional inquiry is confined to the question of whether Officer McClelland exercised unreasonable non-deadly force in releasing Shadow to apprehend Jarrett. Taking into account the "jury's discernible resolution of disputed factual issues," Iacobucci, 193 F.3d at 23, we can deduce how the relevant events unfolded. As Officer McClelland was being radioed to the scene, he overheard Officer White's conjecture that Jarrett was a suspect in a prior armed robbery. McClelland arrived shortly after Jarrett's unsuccessful efforts to elude two police officers ended with him crashing his car into a cement post. Jarrett fled the scene of this minor traffic incident, leaping a fence and racing through an unlit residential neighborhood in the middle of the

-20-

night to avoid arrest. Officer McClelland and Shadow finally located Jarrett after tracking him for approximately twenty minutes, and McClelland verbally warned him three times: "Stop, police, or I'll send the dog." At that point Jarrett fled around a corner, and McClelland released Shadow. In the ensuing thirty seconds, Shadow apprehended Jarrett and bit him twice on the leg before Officer McClelland arrived and commanded Shadow to release. McClelland immediately radioed for an ambulance that arrived within five minutes to transport Jarrett to a hospital, and shortly thereafter the appellee received medical treatment for cuts to his lower right leg.

After finding these facts, the jurors determined that McClelland's application of the Town's bite-and-hold policy was unreasonable, apparently because they found the policy itself to be unconstitutional. Their indictment of the bite-and-hold policy, however, finds no support in the case law. In a 1994 dog-biting case factually similar to the case at bar, the Ninth Circuit noted that

> [w]hen the incident that led to the filing of this lawsuit occurred, the use of police dogs to search for and apprehend fleeing or concealed suspects constituted neither a new nor a unique policy. The practice was long-standing, widespread, and well-known. No decision of which we are aware intimated that a policy of using dogs to apprehend concealed suspects, even by biting and seizing them, was unlawful. At the time of the incident in question, the only reported case which had

considered the constitutionality of such a policy had upheld that practice.

Chew v. Gates, 27 F.3d 1432, 1447 (9th Cir. 1994) (citing Robinette, 854 F.2d at 909). We are aware of no post-Chew decisions suggesting that bite-and-hold policies are unconstitutional per se. Indeed, four years after Chew, the Ninth Circuit reiterated in Watkins v. City of Oakland, 145 F.3d 1087 (9th Cir. 1998), that since Chew "there had no been no change in the law that would have alerted [the defendant] that his use of a police dog to search and bite was unconstitutional." Id. at 1092.

The jury thus had no basis to conclude that the Town of Yarmouth's bite-and-hold policy was unconstitutional. Our determination that there is no record support for finding bite-and-hold policies unconstitutional on their face, however, still leaves open the question of whether the particular use of bite-and-hold force at issue here was excessive under the circumstances. Without excluding the importance of other factors, the Graham Court focused its reasonableness inquiry on three factors in particular: 1) whether the suspect is actively resisting arrest or attempting to evade arrest by flight, 2) whether the suspect poses an immediate threat to the safety of the officers or others, and 3) the severity of the crime at issue. Graham, 490 U.S. at 396. As discussed earlier, the jury must have concluded that Jarrett was "attempting to evade arrest by flight" when McClelland released Shadow. With regard to the second factor, McClelland could reasonably have

-22-

concluded that Jarrett posed a threat to the safety of residents in the neighborhood where the chase occurred. Jarrett's behavior after the car accident was erratic, and tended to confirm Officer White's suspicion that Jarrett was a suspect in a prior armed robbery. McClelland could not discern whether Jarrett was armed given the limited visibility, or predict the lengths to which Jarrett would go to avoid arrest. The third Graham factor (the severity of the crime at issue) slightly undermines the objective reasonableness of McClelland's actions. At the time McClelland released Shadow, he knew with certainty only that Jarrett had committed several minor traffic infractions. However, this factor alone is not dispositive, see Graham, 490 U.S. at 396, and we note that at least one other court has upheld the reasonableness of police-dog bites where the victim was only suspected of misdemeanors, see Matthews v. Jones, 35 F.3d 1046, 1048 (6th Cir. 1994).

In the final analysis, after reviewing McClelland's actions without "the 20/20 vision of hindsight," Graham, 490 U.S. at 396, we simply do not find that McClelland's decision to release Shadow was an exercise of objectively unreasonable force under the circumstances. Our legal conclusion that McClelland did not use excessive force to apprehend Jarrett is not inconsistent with the jury's determination after Phase I that Jarrett did use excessive force. As discussed earlier, it appears that the jury initially

-23-

concluded that the Town of Yarmouth's bite-and-hold policy was unconstitutional, and reasoned that any application of that policy must be unconstitutional per se. Their reasoning was erroneous as a matter of law. We conclude after conducting the Graham balancing test that Officer McClelland's release of a dog trained to bite and hold did not violate Jarrett's Fourth Amendment rights as a matter of law.

Our determination that Jarrett suffered no constitutional injury is dispositive of his municipal liability claim against the Town of Yarmouth. As the Supreme Court observed in City of Los Angeles v. Heller, 475 U.S. 796 (1986):

> [N]either Monell . . . nor any other of our cases authorizes the award of damages against a municipal corporation based on the actions of one of its officers when in fact the [court] has concluded that the officer inflicted no constitutional harm. If a person has suffered no constitutional injury at the hands of the individual police officer, the fact that the departmental regulations might have authorized the use of constitutionally excessive force is quite beside the point.

Id. at 799 (original emphasis). Consequently, Jarrett's municipal liability claim against the Town of Yarmouth must fail as a matter of law.

## IV.

We conclude that Officer McClelland did not violate Jarrett's Fourth Amendment rights by using excessive force to apprehend him on the night in question. In the absence of any

constitutional violation, the verdicts against Officer McClelland, Chief Chapman and the Town of Yarmouth must be vacated. The decision of the district court is **reversed**, and this case is **remanded** for entry of judgment in favor of defendants McClelland, Chapman, and the Town of Yarmouth.

It is so ordered.