# United States Court of Appeals
## For the First Circuit

No. 03-1170
No. 03-1533

BERNARD FLOWERS,

Plaintiff, Appellant,

v.

OFFICER DARREN FIORE, OFFICER LAWRENCE SILVESTRI, OFFICER MICHAEL
GARAFOLA, and THE TOWN OF WESTERLY, RHODE ISLAND,

Defendants, Appellees.

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

(Hon. Ernest C. Torres, U.S. District Judge)

Before

Boudin, Chief Judge,
Selya, Circuit Judge,
and Stahl, Senior Circuit Judge.

Thomas G. Briody for appellant.
Michael J. Colucci, with whom Olenn & Penza LLP was on brief
for appellees.

February 25, 2004

**STAHL**, <u>**Senior Circuit Judge**</u>. Plaintiff-appellant Bernard Flowers appeals from the district court's grant of summary judgment in favor of defendant-appellees Darren Fiore, Michael Garafola, Lawrence Silvestri, and the Town of Westerly, Rhode Island ("Town"). Flowers' suit asserted violations of his constitutional rights under the Fourth and Fourteenth Amendments as well as pendent state law claims arising out of his stop and detention by members of the Westerly Police Department.

I. BACKGROUND

We draw the following recitation of facts from the summary judgment record, which includes Flowers' complaint, affidavits submitted by the defendant police officers, logs of radio transmissions and telephone calls related to the incident, and a complaint submitted by Flowers to the ACLU. We note where facts are in dispute.

On September 24, 2001, at approximately 11:55 a.m., the Westerly Police received a telephone call from Nunzio Gaccione, a Westerly resident. Gaccione "guess[ed] there was a little fight there with Butch Corbin and a couple other people" and that he "just got word that Corbin is sending two colored people over here to start some trouble." The dispatcher then radioed for Officer Fiore to respond to the complaint at Gaccione's residence on Ashaway Road. Fiore arrived at the residence within four to five minutes and met with Gaccione. Gaccione related that he received

-2-

a call from Maurice O'Rourke, who stated that another individual, Michael Corbin, was sending two African-American men to Gaccione's home with a gun.  Gaccione said that he believed this was because his grandson, Jason Bolduc, "works with a guy that Corbin knows and they had some type of falling out."  Fiore claims to be familiar with Corbin and Bolduc, as both in the past have been involved in several disturbances and possible drug activity.

Gaccione then told Fiore that he had seen two African-American men in a small gray or black vehicle drive by his home about five minutes prior to Fiore's arrival.  Gaccione believed that these men may have been the ones to whom O'Rourke referred.

At 12:12 p.m., Fiore detailed Gaccione's complaint, including the description of the suspects, into his log.  Fiore alerted on his radio that police should be looking for a small gray or black vehicle with two black men, possibly armed.  He further stated that he was "not too sure what it is" and that "they made threats over here at the Gaccione complex."

Next, Fiore took a post at the intersection of Route 3 and Danielle Drive, which is about half a mile east of the Gaccione residence along Route 3.  He chose this particular location upon a belief that the suspect vehicle would return to the Gaccione residence after having passed by the Gaccione residence the first time.  Some twenty to thirty minutes later, Fiore noticed a small gray car moving through the intersection of Route 3 and Danielle

-3-

Drive. Fiore thought that about twenty minutes had elapsed since he took his position on Route 3. He conceded, however, that the time interval may have been as long as thirty minutes, as radio logs indicated. He "caught a side view of [the occupant of the car] and saw that it was a black male." Prior to observing this particular vehicle, Fiore did not notice any other cars with African-American male occupants drive by his post.

Fiore decided to follow this vehicle because "it fit the description of the Gaccione complaint and it was heading in the direction of the Gaccione residence."[1] Although he noticed only one occupant, he believed that the other suspect either could have been dropped off at another location or was hiding in the vehicle. At 12:42 p.m., Fiore notified dispatchers that he was following a

_____

[1]The district court recounted that "Fiore followed [Flowers'] vehicle and used his onboard computer to perform a registration check" and that "[t]he information received by Fiore was that the license plate on Flowers' vehicle had been issued to a vehicle different from the one that Flowers was driving." Flowers v. Fiore, 239 F. Supp.2d 173, 176 (D. Mass. 2003). The court continued, "Accordingly, Fiore radioed for help and signaled Flowers to pull over." Id. The record contains inconsistent statements by Fiore, however, as to when he conducted the check, whether it was before he pulled Flowers over or after Flowers had been released. Fiore's police report, written just after the incident, indicates that he "noticed a problem with Flowers' license plate after clearing the stop." In his affidavit, Fiore stated that before he pulled over Flowers, he "noticed really quick" that the plates did not match the vehicle. He attempted to reconcile his statement with the police report by suggesting that he "should have put 'remembered' in place of 'noticed'" in the police report because he "had noticed [the discrepancy] on the computer screen prior to the stop." Fiore now claims that the license plate discrepancy played no role in his decision to follow and stop the vehicle.

vehicle on Route 3. He based his "probable cause" to stop the vehicle on his belief that "the description of the vehicle fit the description by Mr. Gaccione, there was a black male that was operating the vehicle . . . the close proximity of the time of the call and the fact that it was heading toward Mr. Gaccione's residence."

After following the vehicle approximately one mile, Fiore activated his lights and signaled for Flowers to pull over. Both eventually stopped on High Street, approximately half a mile west of the Gaccione residence along Route 3. Fiore assumed that dispatch would send backup "because of the situation," and accordingly pulled Flowers over to a location near where he "knew backup was coming from a car stop." He instructed Flowers over the loudspeaker to remain in the vehicle. Next, two backup officers, Lawrence Silvestri and Michael Garafola, arrived in separate police cruisers. Garafola left his vehicle with a shotgun ready in hand. Fiore, again using the loudspeaker, directed Flowers to extend his arms out the window and then open the car door and exit the vehicle. Flowers complied. Fiore then directed Flowers to turn around with his hands in the air and walk backwards towards the officers. From the time they arrived and exited their vehicles, each officer had his weapon drawn.

Flowers contends that when he reached the officers, his "hands were forced behind [him], handcuffs were placed [on him] and

[he] was dropped to [his knees]." Fiore claims that the officers directed Flowers to kneel on the road beside his car and lace his fingers behind his head, and that then Flowers was handcuffed, frisked, and placed in the back of Fiore's cruiser. All three officers also claim that they followed standard procedure for a high-risk (or felony) stop and that it was necessary to do so because they felt that there was a danger to their safety.[2]

While Flowers was in the back of the police cruiser, the backup officers searched Flowers' vehicle for weapons and a possible other suspect. Fiore claims that when nothing was recovered, he took Flowers out of the cruiser, removed his handcuffs, and explained why he was stopped. Flowers claims that Fiore first approached him and said, "Mr. Gaccione reported two black men threatened him and they had guns so you understand why I had to do what I had to do." Fiore then added that the two black men had a gray vehicle. With no apology, Flowers was ordered back to his car.

Fiore contends that he explained the situation to Flowers, at which time Flowers became very angry and accused him of

_____

[2]In his January 17, 2002 affidavit, Officer Fiore described a high risk motor vehicle stop as "a motor vehicle stop when there is a possibility of danger to the officer stopping the vehicle." In his March 12, 2002 affidavit, Officer Silvestri stated that upon his arrival at the scene, the officers decided to employ felony car stop tactics. He defined "felony car stop" to be the following: "Weapons drawn, have him walk to us, secure him, and then clear the car." Both affidavits are in the record on summary judgment.

racial profiling. Flowers then asked Fiore to use his phone so he could call his wife (who was working nearby and awaiting his arrival). Fiore responded that he did not have a phone. He suggested that Flowers use the phone at the gym across the street and then ordered Flowers to move his car. Flowers then went back to his car and drove to the local hospital, where his wife worked.

By this time, both backup officers had driven away. Fiore proceeded to make "a couple passes by the Gaccione residence" until the end of his shift. Thereafter, he did not re-take a post to look for a suspect vehicle "because of the time that had gone by" and his belief that "the immediate threat had pretty much diminished."

Pursuant to 42 U.S.C. § 1983, Flowers brought this action against Officers Fiore, Silvestri, and Garafola, and the Town of Westerly, claiming (1) that the police officers detained him because of his race, in violation of the Equal Protection Clause of the Fourteenth Amendment, U.S. Const. amend. XIV, § 1; and (2) that the officers detained him without probable cause and used excessive force, and that the Town failed to properly train and supervise the officers, in violation of his right against unreasonable government search and seizure under the Fourth and Fourteenth Amendments of the federal Constitution. Flowers also asserted state law claims for assault and battery, false imprisonment, and intentional infliction of emotional distress, as

well as for violations of his rights under Article 1, sections 2 and 6 of the Rhode Island Constitution. After the close of discovery, defendants moved for summary judgment, arguing that there were no constitutional violations, and that they were shielded from liability by the doctrine of qualified immunity. Upon determining that no constitutional rights had been violated, the court did not reach the issue of qualified immunity and granted summary judgment in favor of the defendants.[3] This appeal followed.

## II. DISCUSSION

We review a grant of summary judgment de novo. Singh v. Blue Cross/Blue Shield of Mass., Inc., 308 F.3d 25, 31 (1st Cir. 2002). Only where there is no genuine issue of material fact will the moving party be entitled to summary judgment. Fed. R. Civ. P. 56(c). A genuine issue of material fact is one that "properly can be resolved only by a finder of fact because [it] may reasonably be resolved in favor of either party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986). A fact is "material" if it "might affect the outcome of the suit" under the applicable legal standard. Id. at 248. In deciding whether a genuine issue of

---

[3]In an exercise of its discretion not to retain supplemental jurisdiction over remaining pendent state law claims, the district court declined to address the summary judgment motion with respect to Flowers' state law claims and dismissed them without prejudice. See 28 U.S.C. § 1367(c). See also United Mine Workers of Am. v. Gibbs, 383 U.S. 715, 726 (1966); Rodriguez v. Doral Mortgage Corp., 57 F.3d 1168, 1177 (1st Cir. 1995).

material fact exists, we view the evidence in the light most favorable to the nonmovant and draw all reasonable inferences in that party's favor. See Carroll v. Xerox Corp., 294 F.3d 231, 237 (1st Cir. 2002); United States v. One Parcel of Real Property, 960 F.2d 200, 204 (1st Cir. 1992).

A. The Stop and Detention

For purposes of determining whether the stop and detention were constitutionally permissible, we must first decide whether the officers' actions amounted to an investigatory stop or was so intrusive as to constitute a de facto arrest. The detention of a person whose automobile has been stopped is a "seizure" within the Fourth Amendment's prohibition against "unreasonable searches and seizures." Whren v. United States, 517 U.S. 806, 809-10 (1996). A brief investigatory detention does not violate the Fourth Amendment if the officers have a "reasonable and articulable suspicion" of past or present criminal activity. United States v. McCarthy, 77 F.3d 522, 529 (1st Cir. 1996). It was in Terry v. Ohio, 392 U.S. 1 (1968) where the Supreme Court first gave effect to this notion that some types of encounters between citizens and law enforcement -- such as brief detainments in the nature of a "stop and frisk" -- could constitute "seizures" for Fourth Amendment purposes, yet be sufficiently limited in their intrusiveness to fall outside the traditional understanding of an "arrest." See also Dunaway v. New York, 442 U.S. 200, 208-09

-9-

(1979). Where police actions taken during the detention exceed what is necessary to dispel the suspicion that justified the stop, the detention may amount to an "arrest" and is lawful only if it is supported by probable cause. United States v. Quinn, 815 F.2d 153, 156 (1st Cir. 1987).

The Supreme Court has stated that "the exception for limited intrusions that may be justified by special law enforcement interests is not confined to the momentary, on-the-street detention accompanied by a frisk for weapons involved in Terry and Adams [v. Williams, 407 U.S. 143 (1972)]." Michigan v. Summers, 452 U.S. 692, 700 (1981). Since Terry, the Terry exception allowing detentions without probable cause has been broadened to encompass other situations where officers may make brief investigative stops and detain individuals upon reasonable suspicion that they may have committed, are committing, or are about to commit a crime. There is no "'litmus-paper test'" to determine whether a particular detention goes beyond a Terry stop and amounts to a de facto arrest. United States v. Acosta-Colon, 157 F.3d 9, 14 (1st Cir. 1998) (quoting Florida v. Royer, 460 U.S. 491, 506 (1983)). Generally, we say that an investigatory stop constitutes a de facto arrest "when a 'reasonable man in the suspect's position would have understood his situation,' in the circumstances then obtaining, to be tantamount to being under arrest." United States v. Zapata, 18 F.3d 971, 975 (1st Cir. 1994) (quoting Berkemer v. McCarty, 468

U.S. 420, 441 (1984)). However, in a borderline case where the detention at issue has one or two arrest-like features but otherwise is consistent with a Terry stop, it will not be obvious just how the detention at issue ought reasonably to have been perceived. Such a case requires a fact-specific inquiry into whether the measures used by the police were reasonable in light of the circumstances that prompted the stop or that developed during the course of the stop. See United States v. Young, 105 F.3d 1, 8 (1st Cir. 1997) ("our cases in this area evince the fact specific nature of the inquiry"). In the present case, we conclude that the actions of the police during the stop and detention did not go beyond an investigatory Terry stop and did not amount to an arrest.

While Terry stops generally are fairly unintrusive, we have repeatedly stressed that officers may take necessary steps to protect themselves if the circumstances reasonably warrant such measures. See United States v. Lee, 317 F.3d 26, 31-32 (1st Cir. 2003); Acosta-Colon, 157 F.3d at 18; United States v. Trullo, 809 F.2d 108, 113 (1st Cir. 1987). Similarly, other circuits have held that police officers may draw their weapons without transforming an otherwise valid Terry stop into an arrest. See, e.g., United States v. Alvarez, 899 F.2d 833, 838 (9th Cir. 1990), cert. denied, 498 U.S. 1024 (1991); United States v. Taylor, 857 F.2d 210, 214 (4th Cir. 1988); United States v. Serna-Barreto, 842 F.2d 965, 968 (7th Cir. 1988); United States v. Jones, 759 F.2d 633, 638 (8th

-11-

Cir.), cert. denied, 474 U.S. 837 (1985); United States v. Jackson, 652 F.2d 244, 249 (2d Cir. 1981).  Here, the officers drew their firearms because they were faced with a report of an armed threat. Moreover, upon restraining Flowers, they immediately holstered their weapons.  It was not unreasonable under the circumstances for the officers to execute the Terry stop with their weapons drawn.

As for the officers' use of handcuffs during the stop, we in the past have required the government to point to "some specific fact or circumstance that could have supported a reasonable belief that the use of such restraints was necessary to carry out the legitimate purposes of the stop without exposing law enforcement officers, the public, or the suspect himself to an undue risk of harm."  Acosta-Colon, 157 F.3d at 18-19.  Where, as here, police officers have information that a suspect is currently armed and that a crime involving violence may soon occur, they are justified in using restraints such as handcuffs without causing an investigatory stop to cross over into an arrest. See Washington v. Lambert, 98 F.3d 1181, 1189 (9th Cir. 1996).

The reasonable use of backup officers is also within the bounds of a Terry stop.  "[M]ere numbers do not automatically convert a lawful Terry stop into something more forbidding." Zapata, 18 F.3d at  976.  We have previously refused to hold that an investigative stop turned into a de facto arrest where five law enforcement officers were present at the scene of the stop.  United

-12-

States v. Trueber, 238 F.3d 79, 94 (1st Cir. 2001). Here, Flowers was stopped and detained by only three officers, only one of whom --Fiore-- was in direct proximity to him while he was detained in the police cruiser. Likewise, the fact that Flowers was placed in the back of a police cruiser does not elevate the detention beyond a Terry stop. See Haynie v. County of Los Angeles, 339 F.3d 1071, 1077 (9th Cir. 2003); United States v. Critton, 43 F.3d 1089, 1092-94 (6th Cir. 1995). Although there may be cases where individually reasonable police actions taken together go beyond the bounds of a Terry stop, such is not the case here where the circumstances justified the officers' overall handling of the situation.

As for the duration of the stop, we must examine whether the police "diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant." United States v. Sharpe, 470 U.S. 675, 686 (1985); see also Royer, 460 U.S. at 500; Summers, 452 U.S. at 701 n.14. There is "no hard-and-fast time limit for a permissible Terry stop." Sharpe, 470 U.S. at 686. Pursuant to Westerly Police Department standard procedure for high-risk (or felony) stops, the officers directed Flowers to kneel on the road next to his car, handcuffed, frisked, and placed him in the back seat of the police cruiser. Officers Silvestri and Garafola then searched Flowers' car for weapons and a possible other suspect. The entire detention took no more than fifteen

minutes. Upon uncovering nothing, Officer Fiore promptly took Flowers out of the cruiser, removed his handcuffs, explained why he was stopped, and allowed him to return to his own car. We stress that the officers did not determine that Flowers was unarmed and that no weapon was hidden in the car until after he had been handcuffed and placed in the cruiser. Flowers presents no evidence that the officers were dilatory in their investigation and we see no way that the officers could have substantially shortened the detention if they were to dispel their suspicions meaningfully.

Admittedly, this case comes close to the line between a Terry stop and a greater intrusion that must be justified by probable cause. However, in addition to our own precedent pointing toward the former, the Sixth Circuit found that an investigatory Terry stop did not escalate into a de facto arrest based on facts almost identical to those at hand. In Houston v. Does, 174 F.3d 809, 815 (6th Cir. 1999), the plaintiffs, suspected of a shooting in an area of Springfield, Ohio, were ordered out of their car at gunpoint by three police officers, placed in handcuffs in the back of a police cruiser, and questioned about the shooting, of which the plaintiffs had no knowledge and denied any involvement. They were detained for at least thirty-three minutes before being released. Id. Here, besides being held for a far shorter period of time, Flowers was never subject to interrogation, which is one intrusive measure less than in Houston.

-14-

It is also noteworthy that the officers never relocated Flowers to a station house or detention area. Nor did they read Flowers Miranda rights. In Acosta-Colon, we held that the detention of a suspect crossed over to a de facto arrest largely due to the fact that customs officers relocated the suspect from the place of the original stop -- an airport gate -- to an official interrogation room some distance from the gate. See 157 F.3d at 15; see also Royer, 460 U.S. at 494. Similarly, the Supreme Court in Dunaway found a de facto arrest where police officers brought the defendant to the police station, read him his Miranda rights, and interrogated him. See 442 U.S. at 212-13. At no point did Officers Fiore, Silvestri, or Garafola interrogate Flowers or remove him from the scene to an official holding area. The entire episode occurred in neutral surroundings -- on a public street. Nor did the officers communicate verbally to Flowers that he was under arrest or that they wanted to arrest him.

The various incidents of the stop and detention -- some arrest-like -- ultimately add up to a situation where the officers responded in an urgent and reasonable fashion to a report of an armed threat that was substantially confirmed by Gaccione's firsthand observation. We stress again that we do not rely on any single factor as legally dispositive, but assess the cumulative impact of the various elements of the stop. We look at the total factual context of the stop, thereby following our directive to

make fact-specific evaluations and inquiries of the situation as a whole. See Young, 105 F.3d at 8. Our conclusion is that the officers' stop and detention of Flowers did not go beyond the boundaries of a Terry stop.

Accordingly, to determine whether the officers' initial stop of Flowers was constitutional, we assess whether the officers had a "reasonable and articulable suspicion" of past or present criminal activity. McCarthy, 77 F.3d at 529. In determining whether a challenged stop is reasonable, and thus, falls within the range of permissible investigatory stops, we engage in a two-step inquiry, asking "(1) whether the officer's action was justified at its inception"; and "(2) whether it was reasonably related in scope to the circumstances justifying the interference in the first place." Terry, 392 U.S. at 19-20; see also United States v. Stanley, 915 F.2d 54, 55 (1st Cir. 1990). The Supreme Court has explained that the question of reasonableness requires a court to "balance[] the nature and quality of the intrusion on personal security against the importance of the governmental interests alleged to justify the intrusion." United States v. Hensley, 469 U.S. 221, 228 (1985). Again, the inquiry is fact specific and we must consider the totality of the circumstances confronting the police at the time of the stop. United States v. Kimball, 25 F.3d 1, 6 (1st Cir. 1994); see also United States v. Rodriguez-Morales, 929 F.2d 780, 783 (1st Cir. 1991), cert. denied, 502 U.S. 1030

-16-

(1992). We also stress that reasonable suspicion is "not amenable to technical formulations that purport to identify the precise types of conduct or sets of circumstances that will or will not permit a police officer to stop and detain an individual." United States v. Sowers, 136 F.3d 24, 28 (1st Cir. 1998) (citing Ornelas v. United States, 517 U.S. 690, 695-96 (1996)).

The district court held that there was no constitutional violation based on four key factual observations: (1) Gaccione reported receiving a threat that two black men with guns were coming to his home "to cause trouble"; (2) Gaccione reported that two black men in a gray or black car had driven by Gaccione's home slowly; (3) "a few minutes later," Fiore observed Flowers, a black man, "driving toward Gaccione's home" in a small gray car; and (4) Flowers' car bore license plates not issued to his vehicle. 239 F. Supp.2d at 177-78. Though we review the record de novo, we will note the district court's factual observations as they bear on the appropriateness of its grant of summary judgment to the defendants.

First, Flowers contends that "there was [n]ever any serious concern that a crime had been or was about to be committed." He argues that Fiore acted unreasonably on Gaccione's "sketchy" complaint that itself was attributed to a man named O'Rourke whom Fiore had never heard of or met. Because Fiore never corroborated the threat with O'Rourke himself, Flowers argues, Fiore had no way to determine or even make a guess as to the

-17-

credibility of the threats.  Flowers fails, however, to address Gaccione's report that since receiving the tip he had seen a gray or black car occupied by two black men pass by his home about five minutes before Fiore's arrival.  Gaccione's firsthand observation of the vehicle and its occupants, uncontroverted by Flowers, lent greater credibility to the reported threat.

Flowers also challenges the district court's version of when and how Fiore discovered a discrepancy between the license plate on Flowers' car and the vehicle's registration.  Though Fiore here on appeal concedes that the discrepancy never figured into his decision to follow and stop Flowers, it is nonetheless disputed whether he knew of the discrepancy before or after the stop.  See supra note 1.

Third, Flowers disputes the district court's statement that Fiore observed Flowers drive past "at approximately 12:30 p.m."  239 F. Supp.2d at 176.  Later in its Memorandum and Order, the court stated that Fiore first noticed Flowers only "a few minutes" after leaving the Gaccione home.  Id.  The police department radio log, however, indicates that Fiore first notified his dispatcher that he was following a vehicle on Route 3 at 12:42:47 p.m.  As Fiore left the Gaccione residence at 12:12 p.m., the log reveals that as long as thirty minutes may have passed before Fiore observed Flowers and decided to follow him.

Finally, Flowers claims that the district court erred on the issues of the route of Flowers' vehicle and the location of the stop. He contends that if Fiore positioned himself near the Gaccione residence and then followed Flowers for approximately one mile before stopping him, Fiore either (1) stopped Flowers as he was driving away from Gaccione's residence, or (2) was positioned more than a mile from the residence when he first noticed Flowers' car. In his affidavit, Fiore stated that he posted himself at the intersection of Route 3 and Danielle Drive, which is about half a mile east of the Gaccione residence along Route 3. From that intersection, one mile westward along Route 3 would put both Fiore and Flowers well past the Gaccione residence. Indeed, Route 3's intersection with Danielle Drive is approximately one mile east of its intersection with High Street, the site of the stop. The Gaccione home on Ashaway Road is halfway between the two intersections.

The district court noted that Fiore observed Flowers "driving toward Gaccione's home." 239 F. Supp.2d at 177. The court did not mention that Flowers had already passed the residence along Route 3 and was at least half a mile east of the residence by the time he was stopped. Flowers contends that this fact throws into question whether Fiore was reasonable in continuing to follow Flowers and stop him after he observed that Flowers did not turn

-19-

into the Gaccione complex, but instead proceeded past it along Route 3.

Despite these apparent errors by the district court and construing the facts in a light most favorable to Flowers, we hold that Fiore's conduct met the double approach adopted in Terry. 392 U.S. at 19-20. Equipped with a description confirmed by Gaccione's firsthand observation, it was reasonable for Fiore to follow the first African-American male in a black or gray car he observed in the immediate area of the Gaccione residence. That as long as half an hour may have elapsed after he left the Gaccione residence (as opposed to twenty minutes) arguably attenuates the reasonableness of Fiore's suspicion that Flowers was indeed the suspect. However, we do not believe that a matter of ten minutes disposes of suspicion altogether, especially when a car and driver substantially matching the given description eventually appear. That Fiore did not see a second African-American male in the car is adequately countered by Fiore's explanation that he thought a second man either could have been dropped off or was hiding in the car. Against the immediacy and gravity of the reported threat, Fiore was justified in following through on his initial observation.

Though Flowers ultimately passed the Gaccione residence along Route 3, Fiore acted reasonably in continuing to follow him and stopping him shortly thereafter, given the possibility that the

-20-

driver could have seen Fiore's marked cruiser and accordingly decided against turning into the driveway of the Gaccione residence. It is important to note that Flowers was headed toward the residence along Route 3 at the time Flowers first observed him. As for the second Terry prong, as set out above, all three officers detained Flowers in a manner "reasonably related in scope to the circumstances justifying the interference in the first place." Terry, 392 U.S. at 20.

As for Silvestri and Garafola, they were reasonable in suspecting that Flowers was one of the armed men in Gaccione's complaint after hearing the alert broadcast by Fiore and his call for backup. Flowers makes no attempt to challenge the two backup officers' conduct during the stop and detention.

In sum, we stress that the government purpose served by the detention in the case is substantial. The nature of the potential criminal conduct, a daylight armed assault involving physical threats, was serious. The stop took place shortly after reports of the threat. Pursuant to Fiore's observation and alert, the officers acted swiftly to dispel any suspicion that they may have had with regard to Flowers. In such cases of quick decisionmaking by law enforcement in potentially dangerous situations, we "should not indulge in unrealistic second-guessing." Sharpe, 470 U.S. at 1575.

As for Flowers' excessive force claim, we similarly conclude that the officers used reasonable measures to restrain Flowers. See Graham v. Connor, 490 U.S. 386, 395-96 (1989) (excessive force claims are judged under an "objective reasonableness" standard; relevant factors include the degree of force used, the severity of the crime at issue, the immediacy of a threat to officers or others, and whether the suspect is resisting arrest or attempting flight). Fiore unholstered his firearm and handcuffed Flowers to ensure his safety and in order to conduct the stop and search without incident. We also agree with the district court that Silvestri and Garafola were reasonable in their momentary display of firearms during the detention, as they justifiably relied on Fiore's initial alert that Flowers may have been one of the armed individuals reported by Gaccione and did so for the limited purpose of protecting themselves and securing Flowers safely.

Again, this is a close case. However, against the proper standard and accounting for the district court's errors and elisions, we in the end conclude that the officers possessed sufficient and reasonable suspicion to stop Flowers and acted reasonably in dispelling that suspicion throughout the course of the detention.

B. Qualified Immunity

Upon finding that there was no constitutional violation, we do not address the issue of qualified immunity. See Saucier v. Katz, 533 U.S. 194, 201 (2001) ("If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity."); Aversa v. United States, 99 F.3d 1200, 1215 (1st Cir. 1996).

C. Equal Protection

Flowers did not raise his equal protection claim in his memorandum in opposition to summary judgment, nor did he argue it in his brief here on appeal. Regardless, his claim fails on the merits. Selective enforcement of motor vehicle laws on the basis of race is a violation of the Equal Protection Clause of the Fourteenth Amendment. See Chavez v. Ill. State Police, 251 F.3d 612, 635 (7th Cir. 2001); see also Whren, 517 U.S. at 813. In order to prevail on his equal protection claim, Flowers must present evidence that he was treated differently from similarly situated non-African-American motorists and that the action taken against him was motivated, at least in part, by his race. See Chavez, 251 F.3d at 635-36, 645. Flowers has presented no evidence that the officers treated him any differently from similarly situated non-African-American motorists. We affirm the district court's grant of summary judgment in favor of the defendants as to Flowers' equal protection claim.

D. Municipal Liability

As the district court stated, "any liability that the Town may have under § 1983 is derivative" from the unconstitutional actions of the defendant police officers. 239 F. Supp.2d at 178 (citing City of Los Angeles v. Heller, 475 U.S. 796, 799 (1986)); see also Jarrett v. Town of Yarmouth, 331 F.3d 140, 151 (1st Cir. 2003). Since there was no unconstitutional conduct on the part of the defendant officers, the Town cannot be found liable. Accordingly, we affirm the district court's grant of summary judgment in favor of the Town as to all of Flowers' federal claims.

E. State Law Claims

We affirm the district court's without prejudice dismissal of Flowers' state claims. See United Mine Workers of Am. v. Gibbs, 383 U.S. 715, 726 (1966) ("[I]f the federal claims are dismissed before trial . . . the state claims should be dismissed as well.").

The district court's grant of summary judgment in favor of defendants is affirmed. No costs are awarded.

**Concurrence follows**.

BOUDIN, **Chief Judge**, concurring in the judgment. Perhaps under the existing case law, Flowers' detention can be classified as a Terry stop rather than an arrest, even though it involved handcuffs and more than a brief encounter and must have been a scary experience, unmitigated even by an apology. United States v. Acosta-Colon, 157 F.3d 9, 18-19 (1st Cir. 1998). If so (and the premise is not wholly secure), the officer did not need probable cause--only a "reasonable and articulable suspicion" of criminal activity on the part of this plaintiff. United States v. McCarthy, 77 F.3d 522, 529 (1st Cir. 1996).

The original tip was not completely anonymous (and this avoids the special problem posed in Florida v. J.L., 529 U.S. 266 (2000)), and some detail (vague motive, loose description) was furnished by the man who summoned the police. But the tip--advising that two black men were coming to cause trouble--was second-hand and somewhat disjointed. Thereafter, two black men in a black or gray car allegedly drove by the house, but they had not stopped, so this fact was of pretty limited value as corroboration of the original tip.

Even if the original tip and drive-by justified suspicion, the question remains whether they justified suspicion of Flowers. The informant claimed to have sighted two black men in a black or gray car. Gray cars are not uncommon; and the one stopped contained one black man--of middle age--rather than the two

-25-

predicted, both of whom would likely have been younger if the story were true and they were the culprits. Also the car was stopped 20 to 30 minutes _after_ the one allegedly driven by the house, further reducing the likelihood that Flowers had anything to do with a prospective crime.

In addition, as the panel opinion shows, there is no clear indication that the plaintiff was driving to the informant's house at the time he was stopped. Seemingly the better inference from the facts recounted is that the plaintiff had driven _past_ the turn-off, and inferences at this stage must be drawn in the plaintiff's favor, Zambrana-Marrero v. Suarez-Cruz, 172 F.3d 122, 125 (1st Cir. 1999). This does not prove that the plaintiff was uninvolved, but it deprives the officer of a piece of evidence in favor of the stop and further undercuts reasonable suspicion.

The Terry stop cases are generally helpful to the police, stressing the ability of an experienced officer to draw inferences and to base reasonable suspicion on an assemblage of small points. See Ornelas v. United States, 517 U.S. 690, 699-700 (1996); United States v. Sokolow, 490 U.S. 1, 9-10 (1989). Still, not every articulable suspicion is reasonable. For example, in Rivera v. Murphy, 979 F.2d 259, 264 (1st Cir. 1992), this court held that police lacked reasonable suspicion to stop a driver who was double parked not far from a pedestrian in a drug-trafficking location.

In this instance, the link between the tip (itself somewhat dubious) and the plaintiff seems to me too thin to support a <u>reasonable</u> suspicion of <u>this</u> plaintiff. There were discrepancies as to timing, the number of persons expected, and (inferentially) age; and there was little basis for supposing that the plaintiff's car, traveling on an open highway, was headed to the informant's house. Nor is there anything here to suggest that a black man driving a gray car on an open highway is a remarkably rare event. The stop may be close to a line that is difficult to draw, but in my view it falls on the wrong side.

There remains no basis for personal liability on the part of the officer under section 1983 (nor, absent a policy or practice, is there municipal liability). <u>City of Canton</u> v. <u>Harris</u>, 489 U.S. 378, 388-89 (1989); <u>Monell</u> v. <u>Dep't of Soc. Servs.</u>, 436 U.S. 658, 694 (1978). Even if a "constitutional" mistake, this one is surely covered by qualified immunity which gives the police latitude to make mistakes on close calls without paying damages. <u>Goyco de Maldonado</u> v. <u>Rivera</u>, 849 F.2d 683, 688 (1st Cir. 1988). Nevertheless, a determination that reasonable suspicion was lacking would be a judgment well worth recording for future guidance of the police. <u>Saucier</u> v. <u>Katz</u>, 533 U.S. 194, 201 (2001).