**Not for Publication in West's Federal Reporter**

# United States Court of Appeals
## For the First Circuit

No. 11-1147

CHRISTOPHER G. MACHADO,

Plaintiff, Appellant,

v.

WEARE POLICE DEPARTMENT, ET AL.,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

[Hon. Steven J. McAuliffe, U.S. District Judge]

Before

Boudin, Howard and Thompson,
Circuit Judges.

Christopher G. Machado on brief pro se.
Charles P. Bauer, Erik G. Moskowitz and Gallagher, Callahan &
Gartrell on brief for appellee.

October 2, 2012

**Per Curiam**.  Christopher Machado brought a section 1983 action against several officers of the Weare, New Hampshire Police Department. 42 U.S.C. § 1983 (2006).  Because Machado is currently incarcerated, his complaint was subject to screening under 28 U.S.C. § 1915A (2006); a magistrate judge recommended dismissal and the district court agreed.  Machado now appeals. Because this is effectively a motion to dismiss, we briefly describe the events based on the allegations of the complaint as well as the exhibits incorporated within it.  See Cruz v. Melecio, 204 F.3d 14, 21 (1st Cir. 2000).[1]

According to Machado's complaint, on April 29, 2009, at approximately 1:00 am, he and his fiancée, Ashley Fermanis, were traveling north on South Stark Highway in New Hampshire. Fermanis drove and Machado sat in the front passenger seat.  Their vehicle caught the attention of Lieutenant James Carney of the Weare Police Department, who was driving behind them, when Fermanis activated her left turn signal for ten seconds and then made an abrupt left turn across two lanes of traffic into the parking lot of the Cold Springs RV Center, which contained recently purchased RV's and trailers.

---

[1]Machado challenges the accuracy of some of the statements of fact in the magistrate judge's report.  We rely on the original record contained in Machado's complaint and not the magistrate judge's report, so the disagreements are irrelevant.

The Cold Springs RV Center was closed at the time--it was, as noted, around 1 am--and the location had been the subject of investigations for burglary and vandalism once or twice during the year prior. Fermanis steered her car next to some new trailers. Carney followed Fermanis into the lot, turned on his blue lights, and halted near Fermanis' car. As Carney walked toward the car, he saw Machado toss an object into the back seat area.

With Machado and Fermanis seated in the car, Carney asked Machado what he had thrown into the back seat. Machado, appearing nervous, reached into the back of the car and produced a curling iron. Carney repeatedly asked Machado to keep his hands where he could see them and then asked him for identification. Machado said that he had none. Carney requested Machado's name, date of birth, and social security number. Machado stated that his name was "Chris," but declined to answer further.

Machado appeared increasingly uncomfortable and began moving about the vehicle; Carney then noticed a bulge near his waistband. He instructed Machado to exit the vehicle, frisked him and discovered that the source of the bulge was a cell phone in a canvas case. He detained Machado for further identification and a background check by handcuffing him and placing him in the back of his police cruiser. Carney then radioed for assistance. At some point, Fermanis indicated to Carney that Machado was wanted by the

Londonderry, New Hampshire police regarding a traffic accident, although when this occurred is unclear.

After placing Machado in the cruiser, Carney returned to the vehicle to speak to Fermanis. She identified Machado by his full name and date of birth. Fermanis also told Carney that he could search her car. When Officer Daniel Aiken and Sargent Robert Peterson arrived on the scene, Carney reconfirmed with Fermanis that he had permission to search her vehicle; and again she assented.

Carney's search turned up a package of cigarettes that contained a plastic bag of what looked to be heroin. Fermanis denied any knowledge that the drugs had been in her car, but indicated that Machado had habitually used heroin as recently as the previous year. Peterson then read Machado his Miranda rights and Machado waived his rights and confessed to possessing the heroin, even volunteering that he had some more hidden in his sock. In the meantime, Carney's background check confirmed that Machado had several active warrants issued in Londonderry, New Hampshire. Fermanis was allowed to leave and Machado was arrested.[2]

Machado was charged in New Hampshire state court with one count of possession of a controlled drug with intent to sell. He

---

[2]It appears from the record that the warrants, relating to a traffic incident involving Machado, were for charges for "conduct after an[] accident, habitual offender, and false report to law enforcement"; Machado's present incarceration seemingly grows out of proceedings relating to one or more of those charges.

moved to suppress the evidence derived from the search of his vehicle as obtained in violation of the New Hampshire and United States Constitutions. The New Hampshire Superior Court granted his motion, finding that the initial stop of his vehicle had violated the New Hampshire Constitution; the charges against Machado were subsequently dropped and his current incarceration is related instead to the subject matter of the warrants revealed after the stop. See note 2, above.

Machado's section 1983 claim targets Carney, Aiken, and Peterson for their conduct during his arrest, as well as Sergeant Louis Chatel, Jr., a supervisor in the Weare Police Department who filed a supporting affidavit explaining the circumstances of Machado's warrantless arrest, and Chief Gregory Begin of the Weare Police Department. Machado alleges that the stop, search, and arrest violated his rights under the Fourth Amendment and the New Hampshire Constitution. He seeks a declaratory judgment as well as compensatory and punitive damages for the emotional distress and collateral legal difficulties he suffered as a result of the arrest.

Civil complaints filed by prisoners against governmental entities, officers, or employees are subject to preliminary review, and dismissed if inter alia they are "frivolous, malicious, or fail[] to state a claim upon which relief may be granted." 28 U.S.C. § 1915A(b)(1) & (2). To determine if the complaint should

be dismissed for failing to state a claim, the screener must determine whether the allegations, construed liberally, "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)(quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)).

Machado's complaint can be read to assert that (treating Carney's activation of his blue lights as arguendo a de facto stop) Carney unlawfully detained Machado at the outset, that Carney unlawfully frisked Machado and thereafter detained Machado in his police cruiser, and that Carney unlawfully arrested Machado after discovering the heroin. We consider each of these potential claims in order, noting that a damage claim against the officers requires not only that a constitutional violation be established on the alleged facts but also that qualified immunity be overcome.

To stop the car in the first instance, Carney had to possess a "reasonable suspicion to believe that criminal activity may be afoot," United States v. Arvizu, 534 U.S. 266, 273 (2002); see also Terry v. Ohio, 392 U.S. 1, 30 (1968), reasonable suspicion standing somewhere above "a mere hunch" and below "probable cause." United States v. Ruidíaz, 529 F.3d 25, 29 (1st Cir. 2008). The suspicion required "specific and articulable facts," United States v. Hensley, 469 U.S. 221, 229 (1985), but is judged on an objective

-6-

basis. Ornelas v. United States, 517 U.S. 690, 696 (1996) (quoting United States v. Cortez, 449 U.S. 411, 417-18 (1981)).

In this case, Carney's suspicion was based on the fact that Fermanis abruptly turned into the parking lot of a closed business, late at night, stopping alongside some new trailers. The location had recently been investigated for incidents of burglary and vandalism. It is arguable that reasonable suspicion was thus established;[3] but even if Carney judged wrong--he is the only defendant implicated in the initial stop--it was a close call and he is plainly protected by qualified immunity. Anderson v. Creighton, 483 U.S. 635, 638 (1987).

The next question is whether Carney's "subsequent actions were fairly responsive to the emerging tableau--the circumstances originally warranting the stop, informed by what occurred, and what the officer learned, as the stop progressed." United States v. Chhien, 266 F.3d 1, 6 (1st Cir. 2001). As Carney approached the vehicle, Carney saw Machado toss something into the back of the car--a common pattern when weapons and contraband are involved. New Hampshire law authorized Carney to demand Machado's full name pursuant to a lawful stop, see N.H. Rev. Stat. Ann. § 594:2 (2012); and Machado enhanced suspicion when he refused to give it.

---

[3]See United States v. Salazar, 609 F.3d 1059, 1069 (10th Cir. 2010); Foley v. Kiely, 602 F.3d 28, 32 (1st Cir. 2010); United States v. Summers, 268 F.3d 683, 687 (9th Cir. 2001); United States v. Walker, 924 F.2d 1, 4 (1st Cir. 1991); United States v. Landry, 903 F.2d 334, 337 (5th Cir. 1990).

Thus Carney was justified in making further inquiries and, in addition, he spotted a bulge near Machado's waistband, entitling him in asking Machado to step out of the car so that Carney could pat him down. United States v. Aitoro, 446 F.3d 246, 253 (1st Cir. 2006). In light of the factors that inspired the initial stop and Machado's subsequent evasive and uncooperative conduct, we cannot say that Carney was unreasonable in suspecting that the bulge was a weapon and that a frisk was necessary to ensure his own safety.

The closest call is Carney's decision to handcuff Machado in the police cruiser. The use of handcuffs "'substantially aggravates the intrusiveness' of a putative Terry stop," United States v. Acosta-Colon, 157 F.3d 9, 18 (1st Cir. 1998)(quoting United States v. Glenna, 878 F.2d 967, 972 (7th Cir. 1989)), and so the officer "must be able to point to some specific fact or circumstance that could have supported a reasonable belief that the use of such restraints was necessary to carry out the stop without exposing law enforcement officers, the public, or the suspect himself to an undue risk of harm." Id. at 19.[4]

---

[4]Examples of such circumstances include when the suspect is uncooperative or raises a reasonable possibility of danger or flight, when the police have information that the suspect is armed, when the stop closely follows a violent crime, or when the police have information that a violent crime is about to occur. See Washington v. Lambert, 98 F.3d 1181, 1189 (9th Cir. 1996).

Placing a suspect into a cruiser does not necessarily transcend the limits of a valid Terry stop. See United States v. Dunbar, 553 F.3d 48, 56 (1st Cir. 2009); Flowers v. Fiore, 359 F.3d 24, 30 (1st Cir. 2004). By the time this occurred in the present case, a basis for continuing the Terry stop had plainly been established: the initial unexplained late night turn into a closed business; the tossing of an object into the back seat; furtive and uncooperative behavior by Machado; and his hampering of a quick resolution by refusing to give his full name which would allow a radio check to see whether he was wanted.

Since Machado would not cooperate, any further useful steps required Carney to question Fermanis, who was unlikely to speak freely while Machado was present; and, given the obvious flight risk, Carney could hardly have allowed Machado to stand alone at any distance from the car or sit in Carney's cruiser unrestrained. Carney could have delayed further questioning until other officers had appeared, but the trade-off between further delay and briefly incapacitating Machado was the kind of judgment officers have to make on the spot.

But even if we assume arguendo that the handcuffs and the detention in the cruiser exceeded the limits of a permissible Terry stop, compare Acosta-Colon, 157 F.3d at 15, with Flowers, 359 F.3d at 30, this is a sufficiently debatable case that an objectively reasonable officer could have believed that his conduct was not

violating Machado's constitutional rights, <u>Anderson</u>, 483 U.S. at 640, which is enough to create qualified immunity. <u>See</u> <u>Malley</u> v. <u>Briggs</u>, 475 U.S. 335, 341 (1986).

By the time Machado was formally arrested, Carney and the other officers had learned that there was a warrant outstanding against him and had also found heroin in his possession.  In the present civil proceedings, this evidence is not subject to the exclusionary rule, <u>United States</u> v. <u>Calandra</u>, 414 U.S. 338, 348 (1974); <u>Townes</u> v. <u>City of N.Y.</u>, 176 F.3d 138, 145 (2d Cir. 1999), and amply provides probable cause to justify his arrest. <u>United States</u> v. <u>Watson</u>, 423 U.S. 411, 423-24 (1976).  Accordingly, all of Carney's actions either did not violate the Fourth Amendment or were protected by qualified immunity.

This in turn resolves claims against other defendants of supervisory and municipal liability.  <u>See</u> <u>Acosta</u> v. <u>Ames Dep't Stores, Inc.</u>, 386 F.3d 5, 12 (1st Cir. 2004); <u>Evans</u> v. <u>Avery</u>, 100 F.3d 1033, 1040 (1st Cir. 1996).  Machado has not argued that New Hampshire law is more favorable to his claims or that those claims should have been left undecided and open for him to pursue in state court so the parallel state claims require no separate discussion.

<u>Affirmed</u>.