JAMES E. GRAVES, JR.,
Circuit Judge, dissenting:
.While I agree that the district court did not find exigent circumstances, I write separately to note my concerns as to the use of the drug detection dog. Although the majority states that a dog sniff is typically not a search, precedent certainly does not support the; conclusion that a dog sniff is neyer a search. In-my view, permitting the indiscriminate use of.a drug detection dog in this 'context seriously undermines the fundamental- right to privacy and security that the Fourth Amendment serves to protect. Consequently, I respectfully dissent as to majority’s holding that the dog. sniff in question is not a search. ■ ¡ .
I.
. To fully consider the authority the government is afforded in this context, it is *166 helpful to review some of the basic principles that govern the scope of the Fourth Amendment’s protections. Under the Fourth Amendment, a “ ‘search’ occurs when an expectation of privacy that society is prepared to consider reasonable is infringed.” United States v. Jacobsen, 466 U.S. 109, 113, 104 S.Ct. 1652, 80 L.Ed.2d 85 (1984). In determining whether a course of official conduct constitutes a search, we analyze whether an “individual manifested a subjective expectation of privacy in the object” of the investigation and “whether the government’s intrusion infringe[d] upon the personal and societal values protected by the Fourth Amendment.” California v. Ciraolo, 476 U.S. 207, 211, 106 S.Ct. 1809, 90 L.Ed.2d 210 (1986) (quotations marks omitted). This inquiry requires consideration of both the reasonableness of the expectation of privacy and “the degree of intrusiveness of the [government’s] challenged action.” Horton v. Goose Creek Indep. Sch. Dist., 690 F.2d 470, 476-77 (5th Cir.1982); see Skinner v. Railway Labor Execs.’ Ass’n, 489 U.S. 602, 616, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989) (“Obtaining and examining ... evidence may ... be a search if doing so infringes an expectation of privacy that society is prepared to recognize as reasonable.” (internal citations omitted)).
Undoubtedly, the officers’ use of a drug detection dog on Beene’s property “[t]o look over ... [his vehicle] for the purpose of finding something” qualified as a “search” as that word is used in the everyday sense. Kyllo v. United States, 533 U.S. 27, 33 n. 1, 121 S.Ct. 2038, 150 L.Ed.2d 94 (2001) (quoting N. Webster, An American Dictionary op the English Language 66 (6th ed.1989)). Whether this investigation constitutes a “Fourth Amendment ‘search,’ ” however, is “not so simple under our precedent.” Id. at 31, 121 S.Ct. 2038. Legitimate expectations of privacy are premised upon “concepts of real or personal property law ,.. [and] understandings that are recognized and permitted by society.” Rakas v. Illinois, 439 U.S. 128, 143 n. 12, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978); accord United States v. Jones, — U.S. -, 132 S.Ct. 945, 951, 181 L.Ed.2d 911 (2012). An individual, for example, may possess an expectation of privacy based on a belief that his or her information “will not be broadcast to the world.” Katz v. United States, 389 U.S. 347, 352, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967).
Nevertheless, while the privacy the Fourth Amendment protects clearly safeguards against the disclosure of personal information, id. at 351-52, 88 S.Ct. 507, its central concern is with the “security of persons against ... invasive acts by ... the Government.” City of Ontario v. Quon, 560 U.S. 746, 755-56, 130 S.Ct. 2619, 177 L.Ed.2d 216 (2010); see also Soldal v. Cook Cnty., 506 U.S. 56, 69, 113 S.Ct. 538, 121 L.Ed.2d 450 (1992) (“What matters is the intrusion on the people’s security from governmental interference.”); see also Alderman v. United States, 394 U.S. 165, 176-80, 89 S.Ct. 961, 22 L.Ed.2d 176 (1969) (holding that the property interest an individual possesses in his home provides protection against electronic surveillance of conversations emanating from within whether or not the individual is party to those conversations). When properly conceived, the amendment’s protections extend beyond the mere preservation of sensitive information.
The Fourth Amendment preserves an individual right to both “privacy and security,” two interests that speak to different, though related, protections against “arbitrary invasions by governmental officials.” Berger v. New York, 388 U.S. 41, 53, 87 S.Ct. 1873, 18 L.Ed.2d 1040 (1967) (emphasis added) (quoting Camara v. Municipal Court, 387 U.S. 523, 528, 87 S.Ct. 1727, 18 *167 L.Ed.2d 930 (1967); accord New Jersey v. T.L.O., 469 U.S. 325, 335, 105 S.Ct. 733, 83 L.Ed.2d 720 (1985)). These interests-are reflected in the amendment's history and its text, which protects “[t]he right of thé people to be secure ... against unreasonable searches and seizures,” and was drafted by the framers in reaction to the British Crown’s arbitrary intrusions upon their property. See Coolidge v. New Hampshire, 403 U.S. 443, 455, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971) (discussing the framers’ desire to create “a right of personal security against arbitrary intrusions by official power”). As the Supreme Court explained more than a century ago, the evils to which the Fourth Amendment was enacted to respond were not limited to “the breaking of [one’s] doors [or] the rummaging of [one’s] drawers.” Boyd v. United States, 116 U.S. 616, 630, 6 S.Ct. 524, 532, 29 L.Ed. 746 (1886), abrogated on other grounds as explained in Fisher v. United States, 425 U.S. 391, 405, 96 S.Ct. 1569, 48 L.Ed.2d 39 (1976). Rather, “the essence of the offense ... is the' invasion of [an individual’s] indefeasible right of personal security, personal liberty and private property.” Id. The Fourth Amendment’s use of the word “secure,” then, reflected the framers’ “dismay with British search and seizure practices, related to the arbitrary exercise of power to invade their property; security for them, was the ability to prevent such invasions.” T. Clancy, The Fourth Amendment: Its History and Interpretation 49 (2008).[1]
Whether an official investigation has invaded a reasonable expectation of privacy depends on the degree of intrusion caused by the government’s actions. See Florida v. Riley, 488 U.S. 445, 451-52, 454-55, 109 S.Ct. 693, 102 L.Ed.2d 835 (1989); United States v. Cuevas-Sanchez, 821 F.2d 248, 251 (5th Cir.1987); Horton, 690 F.2d at 476-77; see also Terry v. Ohio, 392 U.S. 1, 24, 88 S.Ct. 1868; 20 L.Ed.2d 889 (1968) (considering the “nature and-quality of the intrusion on individual rights” in assessing the permissibility of a search for weapons without probable cause). For example, “one who owns or' lawfully possesses or controls property will in all likelihood have a legitimate expectation of privacy by virtue of [his or her] right to exclude.” Rakas, 439 U.S. at 143 n. 12, 99 S.Ct. 421; see United States v. Gomez, 276 F.3d 694, 698 (5th Cir.2001) (holding that a defendant had a reasonable expectation of privacy in a third party’s vehicle parked on the defendant’s driveway based on his “possessory interest in the land”). As a result, investigations that take place upon private property are more intrusive — and more likely to implicate the Fourth Amendment — than those that take place in a public space. Compare Coolidge, 403 U.S. at 474-75, 91 S.Ct. 2022 (“[A] Search or seizure carried out on a suspect’s premises without a warrant is per se unreasonable, unless the police can show it falls within one of a carefully defined set of exceptions -”) with Florida v. White, 526 U.S. 559, 566, 119 S.Ct. 1555, 143 L.Ed.2d 748 (1999) (“[B]ecause the police seized re-spóhdent’s vehicle from a public area ... the warrantless seizure ..did not involve any invasion of respondent’s privacy.”).
Relatedly, “[p]hysically invasive inspection[s] [are] ... more intrusive than pure *168 ly visual inspection[s],’’ and are generally considered a search. Bond v. United States, 529 U.S. 384, 337, 120 S.Ct. 1462, 146 L.Ed.2d 365 (2000); see also Cupp v. Murphy, 412 U.S. 291, 295, 93 S.Ct. 2000, 36 L.Ed.2d 900 (1973) (“Unlike ... fingerprinting ,..,- [a] voice exemplar ..., or [a] handwriting exemplar” taking scrapings from under, a suspect’s fingernails constitutes a “severe, though brief, intrusion” and is therefore a search). The more intrusive the method of investigation, the more likely the technique will constitute , a search under the Fourth Amendment. See Club Retro, L.L.C. v. Hilton, 568 F.3d 181, 196-97 (5th Cir.2009) (holding that officers’ entry into a nightclub was a search where the officers “project[ed] official authority by entering with weapons- drawn in a S.W.A.T. team raid,” and exceeded the scope of the club’s public invitation); compare Maryland v. Macon, 472 U.S. 463, 469, 105 S.Ct. 2778, 86 L.Ed.2d 370 (1985) (holding that an “officer’s actiqn in entering a bookstore and examining the wares that were intentionally exposed to all who frequent the place of business did not infringe a legitimate expectation of privacy”) with Lo-Ji Sales, Inc. v. New York, 442 U.S. 319, 329, 99 S.Ct. 2319, 60 L.Ed.2d 920 (1979) (holding that officers’ inspection of items located behind an enclosed display case constituted a search because it was more intrusive than that of an ordinary customer); compare also Ciraolo, 476 U.S. at 213, 106 S.Ct. 1809 (aerial observation of backyard held not a search where the police were “within public navigable airspace [and observed the space] in a physically nonintrusive manner”), with Cuevas-Sanchez, 821 F.2d at 251 (continuous video surveillance of a backyard held a search because the “intrusion [was] not minimal” and “society is willing to recognize” an expectation to be free from this type of surveillance)." “[W]hat is really involved in Fourth Amendment analysis is our ‘societal understanding* about what deserves ‘protection from government invasion.’” United States v. Smith, 978 F.2d 171, 177 (5th Cir.1992) (citing Oliver v. United States, 466 U.S. 170, 178, 104 S.Ct. 1735, 80 L.Ed.2d 214 (1984)).
II.
It is with reference to these principles that the scope ’ and meaning- of the two categories of cases most directly implicated by this appeal — the open fields and drug detection dog line of cases — must be evaluated. An open field is not open season and a drug detection dog is not free from the application of the Fourth Amendment.
A.
The government first argues that its investigation into the contents of Beene’s vehicle did not implicate the Fourth Amendment because the vehicle was parked outside of the curtilage of his home. This argument oversimplifies the analysis. The Fourth Amendment “protects people, not places,” Katz, 389 U.S. at 351, 88 S.Ct. 507, and it is implicated even when the government’s intrusion occurs at a “location not within the catalog (persons, houses, papers, and effects)” specified in its text. See Kyllo, 533 U.S. at 32, 121 S.Ct. 2038 (explaining that the Fourth Amendment applies to the government’s “eavesdropping ... [of conversation in] a telephone booth” even though it is not a person, house, paper, or effect). Merely labeling a location an open field or “[t]erm-ing ... [an] area curtilage expresses a conclusion; it does not advance Fourth Amendment, analysis.” United States v. Wells, 648 F.3d 671, 675 n. 4 (8th Cir.2011) (quoting United States v. Arboleda, 633 F.2d 985, 992 (2d Cir.1980)).
*169 . A careful -reading of the Supreme Court’s open fields precedents demonstrates the scope of the doctrine arid its limits. The concept of-the open field can be traced to the Supreme Court’s decision in Hester v. United States, 265 U.S. 57, 44 S.Ct. 445, 68 L.Ed. 898 (1924). The defendant in Hester was convicted of illegally distilling whiskey based on the testirriony of two federal revenue agents who entered onto his land without a warrant. Id. at 58, 44 S.Ct. 445. Hester was carrying a jug and a-bottle out in the open when he and his accomplice noticed the agents. Id. at 58, 44 S.Ct. 445. At that point, Hester and his accomplice dropped the containers they were carrying and attempted to escape. Id. The agents testified that the jugs and other eontainérs that were dropped córitained illegally distilled whiskey. Id.
In rejecting Hester’s challenge to the officers’ testimony, the Supreme Court held that his “own acts ..disclosed the jug, the jar, and the bottle ... [and there was therefore] no seizure ... when the officers examined the contents of each after it had been abandoned.” Id. Further, the fact that the officers had trespassed onto Hester’s land did not invalidate their actions. Id. According to the Court, “the special protection accorded by the Fourth Amendment to the people in their ‘persons, houses, papers, and effects,’ [did] not extend[ ] to the open fields.” Id. at 59, 44 S.Ct. 445.
Hester’s textually formalistic approach was characteristic of the Supreme Courtis Fourth Amendment jurisprudence until its landmark decision in Katz v. United States, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). In Katz, however, the Supreme Court rejected the notion that “constitutionally protected area[s],” delineated by the textual categories specified in the Amendment, could “serve as a talismanic solution to- every Fourth Amendment problem,” Katz, 389 U.S. at 351 n. 9, 88 S.Ct. 507. “[T]he Fourth Amendment protects people, not places” when individuals, whose “expectations of freedom from intrusion are recognized as reasonable.” Id. at 361, 88 S.Ct. 507 (Harlan, J., concurring).
After Katz, the Supreme Court revisited the open fields doctrine in Oliver v. United States, 466 U.S. 170, 104 S.Ct. 1735, 80 L.Ed.2d 214. (1984), “to determiri[e] whether .the government’s intrusion upon open fields without a warrant or probable cause violates reasonable expectations of privacy and is therefore a search____” 466 U.S. at 178, 104 S.Ct. 1735. Oliver brought up two 'cases‘for review in which the police, acting on information that -did not give to rise to probable cause, trespassed onto private property and discovered marijuana plants being cultivated in outside areas that were,, open and -accessible to the public. Id. at 173-74, 104 S.Ct. 1735.
While reaffirming the validity of the open fields concept, the Supreme Court reinterpreted the doctrine in light of its post-Aafo: jurisprudence. First, with respect to the expectation of privacy, the Court observed' that “open fields do not provide a setting for those intimate activities that the Amendment' is intended to shelter.” Id. at 179, - 104 S.Ct. 1735. Rather, activities “such as the cultivation of crops,”'occur out in the open and can be viewed from outside- through a fence or from the airspace above. Id. at 179, 104 S.Ct. 1735. Second, with respect to the nature of the government’s intrusion, the Court explained that a mere technical trespass onto an open field, without more, was not so offensive as to “infringe[ ] upon the personal and societal values protected by the Fourth Amendment." Id. at 182-83, 104 S.Ct. 1735. “[A]s a practical matter these lands usually are accessible to the public and the police ... [and] in most *170 instances the police will disturb no one when they enter upon open fields.” Id. at 179, 104 S.Ct. 1735.
Oliver’s reframing of the open field’s doctrine, then, was grounded in the same inquiries the Supreme Court has considered since Katz in determining whether police conduct constitutes a Fourth Amendment search: the nature of the privacy interest intruded upon and the degree of intrusion caused by the investigative technique. Rather than providing an unlimited exception to all investigations conducted outside of the curtilage of a home “the rule ... [the Court] reaffirmed] ... provided] that an individual may not legitimately demand privacy for activities conducted out of doors in fields, except in the area immediately surrounding the home.” 466 U.S. at 178, 104 S.Ct. 1735.
In adhering to the language of the opinion, this court has observed that while “Oliver revitalized Hester’s open fields doctrine, ... it explicitly adhered to Katz in doing so.” Husband, v. Bryan, 946 F.2d 27, 29 (5th Cir.1991) (citing Oliver, 466 U.S. at 177-81, 104 S.Ct. 1735). Thus, while the open fields doctrine provides that “the Fourth Amendment does not protect people from official searches characterized as ‘sights seen in the open fields,’ ... [n]either this court nor the Supreme Court have extended the open fields doctrine to anything beyond observation searches.” Id. (quoting Air Pollution Variance Bd. of Colo. v. W. Alfalfa Corp., 416 U.S. 861, 865, 94 S.Ct. 2114, 40 L.Ed.2d 607 (1974)). Indeed, “courts that have upheld surveillance conducted on, over, or from open fields have been careful to note the limited extent of the surveillance and to caution against unrestricted surveillance.” United States v. Lace, 669 F.2d 46, 55 (2d Cir.1982); see also Kee v. City of Rowlett, 247 F.3d 206, 217 n. 21 (5th Cir.2001) (“[T]he open fields doctrine has not been expanded beyond observational searches.”); Allinder v. Ohio, 808 F.2d 1180, 1185 (6th Cir.1987) (“In decisions following Katz, the Supreme Court has consistently adhered to the open field doctrine while at the same time recognizing that it is limited to sights seen in the open field.” (internal quotation marks omitted)); United States v. Bellina, 665 F.2d 1335, 1343 n. 7 (4th Cir.1981) (when analyzing “observations made on [a] defendant’s property .,. [e]ach intrusion must be examined on its own peculiar facts and each must be analyzed in relation to whether the person challenging the intrusion had a legitimate expectation of privacy in the area or thing observed.”); United States v. Jackson, 588 F.2d 1046, 1053 n. 12 (5th Cir.1979) (“[T]his court may .., find a Fourth Amendment violation even though the government agents make their observations from an ‘open field.’”). Indeed, the Supreme Court recently reaffirmed this limitation in Florida v. Jar-dines, explaining that while an officer may “gather information in ... open fields” with greater leeway than in those areas specifically enumerated in the Fourth Amendment’s text, the investigation remains “subject to Katz.” Jardines, 133 S.Ct. at 1414.
Admittedly, an individual’s expectation of privacy in a so-called “open field” is limited. But to say that an expectation of privacy is limited is not to say it does not exist at all. See Smith, 978 F.2d at 180 (“An individual may open the curtains of his home to the view of unenhanced vision without consenting to the view of a telescope.” (quotations omitted)). As we have stated on more than one occasion, “[n]o matter where an individual is, whether in his home, a motel room, or a public park, he is entitled to a ‘reasonable’ expectation of privacy.” Kee, 247 F.3d at 213 (quoting Jackson, 588 F.2d at 1052). Our evaluation of the government’s investigation in *171 this case must be cognizant of these prece-dential limitations.
B.
The scope of the Supreme Court’s holdings with respect to the use of drug detection dogs is similarly limited. The government argues .that the use of a drug detection dog.to determine the contents of a vehicle does not constitute a search for purposes of the Fourth Amendment under any circumstance. Again, the analysis is not so straightforward.
“It is ... important to recognize that' [the Supreme Court has not] validated] the use of drug detection dogs in all circumstances.” 3 W. LaFave, Search and Seizure § 2.2(g) (5th ed.2012); see also United States v. Whitehead, 849 F.2d 849, 857 (4th Cir.1988) (“Place. obviously did not sanction the indiscriminate, blanket use of trained dogs in all contexts.”), abrogated on other grounds by Gozlon-Peretz v. United States, 498 U.S. 395, 111 S.Ct. 840, 112 L.Ed.2d 919 (1991). Rather, the Court has validated the suspicionless use of drug detection dogs to investigate inanimate objects located in public places, see United States v. Place, 462 U.S. 696, 707, 103 S.Ct. 2637, 77 L.Ed.2d 110 (1983), and vehicles stopped on public thoroughfares, see Illinois v. Caballes, 543 U.S. 405, 409, 125 S.Ct. 834, 160 L.Ed.2d 842 (2005). When utilized in the context of a private dwelling, however, the Supreme Court determined that “[t]he government’s use of a trained police dog to investigate the home ... is a ‘search’ within the meaning of the Fourth Amendment.” Jardines, 133 S.Ct. at 1417-18.
The Supreme Court first considered the use of a drug detection dog in United States v. Place, 462 U.S. 696, 103 S.Ct. 2637, 77 L.Ed.2d 110 (1983). Place involved the usé of a drug detection dog to sniff luggage that officers seized in a public, airport. Id. at 706-07, 103 S.Ct. 2637. In analyzing whether the conduct of the police was a search, thé Court analyzed both the nature of the information that was exposed by the sniff and the degree of intrusion that was produced by .the dog. Id. at 707, 103 S.Ct. 2637.
The sniff “disclose[d] only the presence or absence of narcotics” and therefore exposed only limited .information into the private contents of the luggage. Id. at 707, 103 S.Ct. 2637. The use of the dog, in turn)- did “not require opening the luggage” or “rummaging through [its] contents” and therefore was “much less intrusive than a typical search.” Id. Based on these two considerations, the Court concluded that the procedure was limited, “both in the manner in which, the information ¿[was] obtained and in the content of the information revealed." Id. Consequently, the “particular course of investigation the agents ... pursue[d] [in the case] — exposure of respondent’s luggage, which was located - in a public place, to a trained, canine — did, not constitute a ‘search’ within the meaning of the Fourth Amendment.” Id.
The Supreme Court reaffirmed this holding in Illinois v. Caballes, which extended Place to permit “a well-trained narcotics-detection dog ... [to sniff] the exterior of [a] car while [it is] lawfully seized for a traffic violation.” 543 U.S. at 409, 125 S.Ct. 834, Neither case, however, held that the use of a drug detection dog is never a search. Nor has any precedential decision of this circuit extended those holdings to the use of a drug detection dog at a private.residence. Indeed, we have long placed limitations on the use of drug detection dogs, for example, when utilized to investigate an individual’s body. See, e.g., United States v. Kelly, 302 F.3d 291, 294 (5th Cir.2002); Horton, 690 F.2d at 477-79. Our reasoning in those cases did not *172 hinge upon the glib supposition that a dog sniff is never a search; instead, we engaged in a careful consideration of “the degree of personal iritrusiveness” infringed upon by the investigative activity at issue;' Horton, 690 F.2d at 479.
This reasoning was vindicated in Florida v. Jardines — the only case in which, the Supreme Court has considered the use of a drug detection dog’ on private property— where the Court concluded that the use of a drug detection dog to investigate the contents of a home was a Fourth Amendment search, 133 S.Ct. at 1417-18. After Jardines, as a panel of this court recently recognized, the contention that “a sniff is not a search” no matter what the circumstance simply cannot withstand scrutiny.” United States v. Nagy, 524 Fed.Appx. 958, 959 (5th Cir.2013) (per curiam) (unpublished). Accordingly, as with any analysis of investigatory conduct under the Fourth Amendment, the question of whether the use of -a drug detection dog constitutes a search.can.only be answered by considering both the nature of the privacy interest at stake and the intrusion caused by the government’s investigative activity.
III.
As the foregoing analysis illustrates, whether the Fourth Amendment- limited the officers’ ability to utilize a drug detection dog on Beene’s private driveway to determine the contents of his vehicle remains an open question. As an initial matter, although the driveway was not within the curtilage of his home, Beene possessed a reasonable expectation of privacy by virtue of his- “possessory interest in the land” and his “right to exclude others” by virtue of that interest. Gomez, 276 F.3d at 698; see also Rakas, 439 U.S. at 143, 99 S.Ct. 421; Husband, 946 F.2d at 29. Beene also possessed an expectation of privacy in the contents of his vehicle, Arizona v. Gant, 556 U.S. 332, 344-45, 129 S.Ct. 1710, 173 L.Ed.2d-485 (2009); one qualitatively different than that which he would have possessed had the vehicle been situated on - a- public thoroughfare, see Coolidge, 403 U.S. at 460-62, 91 S.Ct. 2022; Gomez, 276 F.3d at 697-98.
Although Beene’s éxpectation of privacy did not reasonably extend to any “activities conducted out of doors,” Oliver, 466 U.S. at 178, 104 S.Ct. 1735, the contents of his' vehicle were not exposed and the officers were unable to' determine what was inside by -viewing it from the driveway. See ROA. 368-69. Consequently, to ascertain the vehicle’s contents, the officers were required to physically encroach further upon Beene’s property with the drug detection dog in order to conduct a more intrusive investigation than a simple “observation search.” Husband, 946 F.2d at 29. The question is whether this additional, more intrusive investigation constitutes a search under the Fourth Amendment. I conclude that it does.
While the officers’ presence on Beene’s property wa's permissible and their “[v]isual surveillance was ... lawful,” see Kyllo, 533 U.S. at 31, 121 S.Ct. 2038, their use of a drug detection dog constituted an additional physical invasion “more intrusive than [a] purely visual inspection.” Bond, 529 U.S. at 337, 120 S.Ct. 1462. This additional physical investigation exceeded the more limited “observation searches,” the Supreme Court has permitted under the open fields doctrine. See Husband, 946 F.2d at 29. The roving “eye cannot .,. be guilty of trespass,” Boyd, 116 U.S. at 628, 6 S.Ct. 524 (quoting Entick v. Carrington, 95 Eng. Rep. 807 (K.B. 1765)), but the Supreme Court has repeatedly found physical invasions that exceed the permissible scope of the government’s presence constitute a Fourth Amendment search. See, e.g., Bond, 529 U.S. at 338-39, 120 *173 S.Ct. 1462 (holding that an officers’ physical manipulation of a bus passenger’s bag constituted a search because the exploratory manner in which the bag was felt exceeded the usual handling that would be expected); Arizona v. Hicks, 480 U.S. 321, 325, 107 S.Ct. 1149, 94 L.Ed.2d 347 (1987) (holding that moving stereo equipment in plain view a “few inches” to record the equipment’s serial numbers constituted a search); New York v. Class, 475 U.S. 106, 114-15, 106 S.Ct. 960, 89, L.Ed.2d 81 (1986) (holding that reaching into a vehicle’s interior constitutes a search); Lo-Ji Sales, 442 U.S. at 329, 99 S.Ct. 2319 (holding that officers’ viewing of a retail establishment’s wares in more physically invasive manner than a customer would view them constituted a search).
Moreover, the very presence of the drug detection dog fundamentally altered the nature of the investigative interaction. Compare Kentucky v. King, 563 U.S. 452; 131 S.Ct. 1849, 1863, 179 L.Ed.2d 865 (2011) (police officers may, consistent with the -Fourth Amendment, bang on the front door of a residence as loud as they can with the hope of being able to view incriminating evidence), with Jardines, 133 S.Ct. at 1416 (police officers may not, consistent with the Fourth Amendment, “introduce[ ] a trained police dog to explore the area around the home in the hopes of discovering incriminating evidence”). A canine’s sniff does not exist in the abstract; it is attached to a large and intimidating animal, which, by virtue of its presence, threatens the sense of security individuals possess in their premises. Oliver was premised on the assumption that the “police will disturb no one when they enter an open field.” ‘ 466 U.S. at 179 n. 10, 104 S.Ct. 1735. Such reasoning-simply doés not apply to thé use of an animal, which serves as a “highly trained tool[ ] of law enforcement,” Jardines, 133 S.Ct. at 1418.
The Supreme Court’s analysis in Florida v.' Jardines supports this conclusion. In Jardines, the Súpleme Court observed that the prospect of “a visitor ... marching his bloodhound into the garden before saying hello,”, would be -so - disruptive to one’s sense of security that it would “inspire most of us to ... call the police.” Id, at 1416. While it is true that this observation was made in a case where the drug detection dog was employed within the curtilage of the home,' the Supreme Court’s recognition of the intrusion felt by the dog’s presence is not-so easily confined to this area.
Drug detection dogs represent a significant “projection, of] official authority,” Club Retro, 568 F.3d at 196, which escalates the intrusive nature of the government’s investigative presence, see Horton, 690 F.2d at 477-78. Any individual who has encountered a drug detection dog in an airport, bus depot, or public sidewalk has experienced the unease that accompanies being confronted with the presence of this intimidating law enforcement tool.[2] In *174 deed, history is replete with examples of officials using trained dogs, sometimes in aid of state sanctioned violence, to intimidate or control American citizens.[3] In the modern law enforcement context, police officers utilize dogs for a multitude of purposes, other than drug detection, including tracking, apprehending, and immobilizing suspects. See Jarrett v. Town of Yarmouth, 331 F.3d 140, 143 (1st Cir.2003) (discussing the use of the “bite and hold” technique that apprehension dogs utilize in which the dog “will bite and maintain his hold upon a suspect until the handler orders him to let go” and may result in a “struggling suspect being bitten several times if the dog loses his grip and is forced to re-establish his hold”).[4] This history and current practice necessarily shape our “societal understanding” about “the measure of the government’s intrusion,” Cuevas-Sanchez, 821 F.2d at 251, and supports the common sense conclusion that the use of a drug detection dog in this context constitutes a search. See Smith, 978 F.2d at 177 (“[A]ny consideration ... about the privacy expectations” in a particular context includes an examination of the role the activity “play[s] in today’s society.”); see also Terry, 392 U.S. at 17 n. 14, 88 S.Ct. 1868 (“[T]he degree of community resentment aroused by particular practices is clearly relevant to an assessment of the quality of the intrusion upon reasonable expectations of personal security....”).
IV.
The majority holds that “[a] dog sniff is typically not a search; it may be conducted even when a detention is not drug-related so long as it does not unreasonably prolong the detention.” I disagree with the majority’s generalization.
Despite what the majority says about exigent circumstances, a decision by the district court to deny the motion to suppress would be erroneous because it would be tied, at least in part, to a finding that the use of the drug detection dog was lawful.[5] Here, the vehicle at issue was parked in a private driveway. The police responded to a report that Beene brandished a weapon and he was arrested for the crime of resisting arrest. The dog used by the police was not a weapon detection dog or a “resisting arrest” dog — it was a drug detection dog.[6] The drug detection dog could not possibly have been searching for evidence of the crime that Beene re *175 portedly committed. See generally Arizona v. Gant, 556 U.S. 332, 353, 129 S.Ct. 1710, 173 L.Ed.2d 485 (2009) (Scalia, J. concurring) (“I would hold that a vehicle search incident to arrest is ipso facto “reasonable” only when the object of the search is evidence of the crime for which the arrest was made, or of another crime that the officer has probable cause to believe occurred.”); see also Andresen v. Maryland, 427 U.S. 463, 480, 96 S.Ct. 2737, 49 L.Ed.2d 627 (1976) (noting the particularity requirement and that “general warrants ... are prohibited by ¿he Fourth Amendment”). Before using the dog, the police recognized that they had no basis to search the vehicle and asked for permission. The use of the drug detection dog constituted an illegal search.
“The decision to characterize an action as a search is in essence a conclusion about whether the fourth amendment applies at all.” Horton, 690 F.2d at 476. The holding in this case that the government’s use of a drug detection dog is not a search provides the government with unfettered authority to do as it pleases in this context without any reasonable constraints. See id. Arguably, based on the logic of this holding, the government may indiscriminately sweep residential driveways and yards, and potentially the common areas of multi-dwelling residences, unrestrained by any need to justify their actions on the basis of facts or particularized suspicion. A free society should not be subject to such an expansive intrusion upon the basic rights of privacy and security individuals enjoy under the constitution. The Fourth Amendment’s fundamental protection is “that in certain places and at certain times ■ [an individual] has the right to be let alone.” Winston v. Lee, 470 U.S. 753, 758, 105 S.Ct 1611, 84 L.Ed.2d 662 (1985) (internal quotations omitted). Under these facts, that right should not be compromised.

. Police dogs are often intentionally employed by law enforcement because of their intimidating presence. See, e.g., Jannay Towne, K9 Fine-Tunes Crime Sniffing Skills, WHOTV, (April 28, 2015, 6:39 PM), http://whotv.com/ 2015/04/28/k9-fine-tunes-crime-sniffing-skill, (Des Moines, Iowa K9 police officer explaining that, "As an intimidation factor, [his police dog is] second to none.”); Iredia Ohenhen, Alija Mehmedovic, Amel Advic, Hunan Richards, The K-9 Unit, An Important Part Of Law Enforcement, CTNOW (Jan. 17, 2012, 8:00 AM), http://www.ctnow.com/about/ studentnews/ctn-the-k9-unit-an-important-part-of-law-enforcement-20-12Q117-story, html. (police dogs are “used to intimidate criminals from trying to escape from the police”); Matt Lait, Role Over for Veteran Police Dog, L.A. TIMES, Jan. 5, 1991, http://articles. latimes.com/1991-01-05/local/me-6943_1_la-habra. (police officer explaining .that "dogs . are used more frequently for mere presence *174 and intimidation” than for other uses) (internal. quotation marks omitted).

. As one commentator observed:
Dogs were used to attack Native Americans .and to chase down runaway slaves. During the Civil War, dogs were used to intimidate and injure African-American soldiers fighting for the North. Following Pearl Harbor, dogs were used to intimidate Japanese Americans residing in Hawaii. In more modern times, police dogs have been used for crowd control, even on. nonviolent civil rights demonstrators.
Leslie A. Lunney, Has the Fourth Amendment Gone to the Dogs?: Unreasonable Expansion of the Canine Sniff Doctrine to Include Sniffs of the Home, 88 Or. L.Rev. 829, 882 (2009).

. It is common for police dogs to be cross-trained for both drug detection and suspect apprehension. Lunney, supra note 3, at 835 n. 20 (citing Deborah Palman, U.S. Police Canine Ass’n, K9 Options for Law Enforcement, http://www.uspcak9.com/2015/06/22/k 9-options-for-law-enforcemem/ (last visited Nov. 9, 2015)).

. The majority states that “[i]f exigent circumstances were present in this case, these taken together with the probable cause created by the exterior dog sniff of Beene’s vehicle, would justify the interior search of his vehicle.”

. The majority states that "[i]n this case, the crime of arrest was resisting arrest. Beene’s vehicle would not contain evidence of that crime.”